TOWNSEND *v.* SAIN, SHERIFF, ET AL.

No. 8. Argued February 19, 1962.—Restored to the calendar for
reargument April 2, 1962.—Reargued October 8–9, 1962.—
Decided March 18, 1963.

*George N. Leighton* reargued the cause and filed a brief for petitioner.

*Edward J. Hladis* reargued the cause for respondents. With him on the brief was *Daniel P. Ward.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This case, in its present posture raising questions as to the right to a plenary hearing in federal habeas corpus, comes to us once again after a tangle of prior proceedings. In 1955 the petitioner, Charles Townsend, was tried before a jury for murder in the Criminal Court of Cook County, Illinois. At his trial petitioner, through his court-appointed counsel, the public defender, objected to the

introduction of his confession on the ground that it was the product of coercion. A hearing was held outside the presence of the jury, and the trial judge denied the motion to suppress. He later admitted the confession into evidence. Further evidence relating to the issue of voluntariness was introduced before the jury. The charge permitted them to disregard the confession if they found that it was involuntary. Under Illinois law the admissibility of the confession is determined solely by the trial judge, but the question of voluntariness, because it bears on the issue of credibility, may also be presented to the jury. See, e. g., *People* v. *Schwartz,* 3 Ill. 2d 520, 523, 121 N. E. 2d 758, 760; *People* v. *Roach,* 369 Ill. 95, 15 N. E. 2d 873. The jury found petitioner guilty and affixed the death penalty to its verdict. The Supreme Court of Illinois affirmed the conviction, two justices dissenting. *People* v. *Townsend,* 11 Ill. 2d 30, 141 N. E. 2d 729. This Court denied a writ of certiorari. 355 U. S. 850.

Petitioner next sought post-conviction collateral relief in the Illinois State courts. The Cook County Criminal Court dismissed his petition without holding an evidentiary hearing. The Supreme Court of Illinois by order affirmed, holding that the issue of coercion was *res judicata,* and this Court again denied certiorari. 358 U. S. 887. The issue of coercion was pressed at all stages of these proceedings.

Having thoroughly exhausted his state remedies, Townsend petitioned for habeas corpus in the United States District Court for the Northern District of Illinois. That court, considering only the pleadings filed in the course of that proceeding and the opinion of the Illinois Supreme Court rendered on direct appeal, denied the writ. The Court of Appeals for the Seventh Circuit dismissed an appeal. 265 F. 2d 660. However, this Court granted a petition for certiorari, vacated the judgment and remanded for a decision as to whether, in the light of the

state-court record, a plenary hearing was required. 359 U. S. 64.

On the remand, the District Court held no hearing and dismissed the petition, finding only that "Justice would not be served by ordering a full hearing or by awarding any or all of [the] relief sought by Petitioner." The judge stated that he was satisfied from the state-court records before him that the decision of the state courts holding the challenged confession to have been freely and voluntarily given by petitioner was correct, and that there had been no denial of federal due process of law. On appeal the Court of Appeals concluded that "[o]n habeas corpus, the district court's inquiry is limited to a study of the *undisputed* portions of the record" and that the undisputed portions of this record showed no deprivation of constitutional rights. 276 F. 2d 324, 329. We granted certiorari to determine whether the courts below had correctly determined and applied the standards governing hearings in federal habeas corpus. 365 U. S. 866. The case was first argued during the October Term 1961. Two of the Justices were unable to participate in a decision, and we subsequently ordered it reargued. 369 U. S. 834. We now have it before us for decision.

The undisputed evidence adduced at the trial-court hearing on the motion to suppress showed the following. Petitioner was arrested by Chicago police shortly before or after 2 a. m. on New Year's Day 1954. They had received information from one Campbell, then in their custody for robbery, that petitioner was connected with the robbery and murder of Jack Boone, a Chicago steelworker and the victim in this case. Townsend was 19 years old at the time, a confirmed heroin addict and a user of narcotics since age 15. He was under the influence of a dose of heroin administered approximately one and one-half hours before his arrest. It was his practice to take injections three to five hours apart. At about 2:30 a. m.

petitioner was taken to the second district police station and, shortly after his arrival, was questioned for a period variously fixed from one-half to two hours. During this period, he denied committing any crimes. Thereafter at about 5 a. m. he was taken to the 19th district station where he remained, without being questioned, until about 8:15 p. m. that evening. At that time he was returned to the second district station and placed in a line-up with several other men so that he could be viewed by one Anagnost, the victim of another robbery. When Anagnost identified another man, rather than petitioner, as his assailant, a scuffle ensued, the details of which were disputed by petitioner and the police. Following this incident petitioner was again subjected to questioning. He was interrogated more or less regularly from about 8:45 until 9:30 by police officers. At that time an Assistant State's Attorney arrived. Some time shortly before or after nine o'clock, but before the arrival of the State's Attorney, petitioner complained to Officer Cagney that he had pains in his stomach, that he was suffering from other withdrawal symptoms, that he wanted a doctor, and that he was in need of a dose of narcotics. Petitioner clutched convulsively at his stomach a number of times. Cagney, aware that petitioner was a narcotic addict, telephoned for a police physician. There was some dispute between him and the State's Attorney, both prosecution witnesses, as to whether the questioning continued until the doctor arrived. Cagney testified that it did and the State's Attorney to the contrary. In any event, after the withdrawal symptoms commenced it appears that petitioner was unresponsive to questioning. The doctor appeared at 9:45. In the presence of Officer Cagney he gave Townsend a combined dosage by injection of $\frac{1}{8}$-grain of phenobarbital and 1/230-grain of hyoscine. Hyoscine is the same as scopolamine and is claimed by petitioner in this proceeding to have the properties of a "truth serum."

The doctor also left petitioner four or five ¼-grain tablets of phenobarbital. Townsend was told to take two of these that evening and the remainder the following day. The doctor testified that these medications were given to petitioner for the purpose of alleviating the withdrawal symptoms; the police officers and the State's Attorney testified that they did not know what the doctor had given petitioner. The doctor departed between 10 and 10:30. The medication alleviated the discomfort of the withdrawal symptoms, and petitioner promptly responded to questioning.

As to events succeeding this point in time on January 1, the testimony of the prosecution witnesses and of the petitioner irreconcilably conflicts. However, for the purposes of this proceeding both sides agree that the following occurred. After the doctor left, Officer Fitzgerald and the Assistant State's Attorney joined Officer Cagney in the room with the petitioner, where he was questioned for about 25 minutes. They all then went to another room; a court reporter there took down petitioner's statements. The State's Attorney turned the questioning to the Boone case about 11:15. In less than nine minutes a full confession was transcribed. At about 11:45 the questioning was terminated, and petitioner was returned to his cell.

The following day, Saturday, January 2, at about 1 p. m. petitioner was taken to the office of the prosecutor where the Assistant State's Attorney read, and petitioner signed, transcriptions of the statements which he had made the night before. When Townsend again experienced discomfort on Sunday evening, the doctor was summoned. He gave petitioner more ¼-grain tablets of phenobarbital. On Monday, January 4, Townsend was taken to a coroner's inquest where he was called to the witness stand by the State and, after being advised of his right not to testify, again confessed. At the time of the inquest petitioner was without counsel. The public defender was not

appointed to represent him until his arraignment on January 12.

Petitioner testified at the motion to suppress to the following version of his detention. He was initially questioned at the second district police station for a period in excess of two hours. Upon his return from the 19th district and after Anagnost, the robbery victim who had viewed the line-up, had identified another person as the assailant, Officer Cagney accompanied Anagnost into the hall and told him that he had identified the wrong person. Another officer then entered the room, hit the petitioner in the stomach and stated that petitioner knew that he had robbed Anagnost. Petitioner fell to the floor and vomited water and a little blood. Officer Cagney spoke to Townsend 5 or 10 minutes later, Townsend told him that he was sick from the use of drugs, and Cagney offered to call a doctor if petitioner would "cooperate" and tell the truth about the Boone murder. Five minutes later the officer had changed his tack; he told petitioner that he thought him innocent and that he would call the doctor, implying that the doctor would give him a narcotic. The doctor gave petitioner an injection in the arm and five pills. Townsend took three of these immediately. Although he felt better, he felt dizzy and sleepy and his distance vision was impaired. Anagnost was then brought into the room, and petitioner was asked by someone to tell Anagnost that he had robbed him. Petitioner then admitted the robbery, and the next thing he knew was that he was sitting at a desk. He fell asleep but was awakened and handed a pen; he signed his name believing that he was going to be released on bond. Townsend was taken to his cell but was later taken back to the room in which he had been before. He could see "a lot of lights flickering," and someone told him to hold his head up. This went on for a minute or so, and petitioner was then again taken back to his cell. The next morning peti-

tioner's head was much clearer, although he could not really remember what had occurred following the injection on the previous evening. An officer then told petitioner that he had confessed. Townsend was taken into a room and asked about a number of robberies and murders. "I believe I said yes to all of them." He could not hear very well and felt sleepy. That afternoon, after he had taken the remainder of the phenobarbital pills, he was taken to the office of the State's Attorney. Half asleep he signed another paper although not aware of its contents. The doctor gave him six or seven pills of a different color on Sunday evening. He took some of these immediately. They kept him awake all night. The following Monday morning he took more of these pills. Later that day he was taken to a coroner's inquest. He testified at the inquest because the officers had told him to do so.

Essentially the prosecution witnesses contradicted all of the above. They testified that petitioner had been questioned initially for only one-half hour, that he had scuffled with the man identified by Anagnost, and not an officer, and that he had not vomited. The officers and the Assistant State's Attorney also testified that petitioner had appeared to be awake and coherent throughout the evening of the 1st of January and at all relevant times thereafter, and that he had not taken the pills given to him by the doctor on the evening of the 1st. They stated that the petitioner had appeared to follow the statement which he signed and which was read to him at the State's Attorney's office. Finally they denied that any threats or promises of any sort had been made or that Townsend had been told to testify at the coroner's inquest. As stated above counsel was not provided for him at this inquest.

There was considerable testimony at the motion to suppress concerning the probable effects of hyoscine and phenobarbital. Dr. Mansfield, who had prescribed for

petitioner on the evening when he had first confessed, testified for the prosecution. He stated that a full therapeutic dose of hyoscine was 1/100 of a grain; that he gave Townsend 1/230 of a grain; that "phenobarbital . . . reacts very well combined with [hyoscine when] . . . you want to quiet" a person; that the combination will "pacify" because "it has an effect on the mind"; but that the dosage administered would not put a person to sleep and would not cause amnesia or impairment of eyesight or of mental condition. The doctor denied that he had administered any "truth serum." However, he did not disclose that hyoscine is the same as scopolamine or that the latter is familiarly known as "truth serum." Petitioner's expert was a doctor of physiology, pharmacology and toxicology. He was formerly the senior toxicological chemist of Cook County and at the time of trial was a professor of pharmacology, chemotherapy and toxicology at the Loyola University School of Medicine. He testified to the effect of the injection upon a hypothetical subject, obviously the petitioner. The expert stated that the effect of the prescribed dosage of hyoscine upon the subject, assumed to be a narcotic addict, "would be of such a nature that it could range between absolute sleep . . . and drowsiness, as one extreme, and the other extreme . . . would incorporate complete disorientation and excitation . . . ." And, assuming that the subject took ⅛-grain phenobarbital by injection and ½-grain orally at the same time, the expert stated that the depressive effect would be accentuated. The expert testified that the subject would suffer partial or total amnesia for five to eight hours and loss of near vision for four to six hours.

The trial judge summarily denied the motion to suppress and later admitted the court reporter's transcription of the confession into evidence. He made no findings of fact and wrote no opinion stating the grounds of his deci-

sion.[1]   Thereafter, for the purpose of testing the credibility of the confession, the evidence relating to coercion was placed before the jury.   At that time additional noteworthy testimony was elicited.   The identity of hyoscine and scopolamine was established (but no mention of the drug's properties as a "truth serum" was made).   An expert witness called by the prosecution testified that Townsend had such a low intelligence that he was a near mental defective and "just a little above moron."   Townsend testified that the officers had slapped him on several occasions and had threatened to shoot him.   Finally, Officer Corcoran testified that about 9 p. m., Friday evening before the doctor's arrival, Townsend had confessed to the Boone assault and robbery in response to a question propounded by Officer Cagney in the presence of Officers Fitzgerald, Martin and himself.   But although Corcoran, Cagney and Martin had testified extensively at the motion to suppress, none had mentioned any such confession.   Furthermore, both Townsend and Officer Fitzgerald at the motion to suppress had flatly said that no statement had been made before the doctor arrived.   Although the other three officers testified at the trial, not one of them was asked to corroborate this phase of Corcoran's testimony.

---

[1] The final defense witness who testified at the motion to suppress was excused.   The following then transpired:

"MR. BRANION [a defense attorney]: That's all we have, if the Court please.

"The COURT: The defense rests on this hearing?

"MR. BRANION: Defense rests.

"The COURT: Anything further from the State?

"MR. McGOVERN: The State rests for the purpose of this hearing, Judge.

"The COURT: Gentlemen, the Court will deny the motion to suppress and admit the statement into evidence and we will proceed with the presentation of the evidence [to the jury]."

It was established that the homicide occurred at about 6 p. m. on December 18, 1953. Essentially the only evidence which connected petitioner with the crime, other than his confession, was the testimony of Campbell, then on probation for robbery, and of the pathologist who performed the autopsy on Boone. Campbell testified that about the "middle" of December at about 8:30 p. m. he had seen Townsend walking down a street in the vicinity of the murder with a brick in his hand. He was unable to fix the exact date, did not know of the Boone murder at the time and, so far as his testimony revealed, had no reason to suspect that Townsend had done anything unlawful previous to their meeting.

The pathologist testified that death was caused by a "severe blow to the top of his [Boone's] head . . . ." Contrary to the statement in the opinion of the Illinois Supreme Court on direct appeal there was no testimony that the wounds were "located in such a manner as to have been inflicted by a blow with a house brick . . . ." 11 Ill. 2d, at 45, 141 N. E. 2d, at 737. In any event, that court characterized the evidence as meagre and noted that "it was brought out by cross-examination that Campbell had informed on the defendant to obtain his own release from custody." 11 Ill. 2d, at 44, 45, 141 N. E. 2d, at 737. Prior to petitioner's trial Campbell was placed on probation for robbery. Justice Schaefer, joined by Chief Justice Klingbiel in dissent, found Campbell's testimony "inherently incredible." 11 Ill. 2d, at 49, 141 N. E. 2d, at 739.

The theory of petitioner's application for habeas corpus did not rest upon allegations of physical coercion. Rather, it relied upon the hitherto undisputed testimony and alleged: (1) that petitioner vomited water and blood at the police station when he became ill from the withdrawal of narcotics; (2) that scopolamine is a "truth serum" and that this fact was not brought out at the motion to sup-

press or at the trial; (3) that scopolamine "either alone or combined with Phenobarbital, is not the proper medication for a narcotic addict [and that] . . . [t]he effect of the intravenous injection of hyoscine and phenobarbital . . . is to produce a physiological and psychological condition adversely affecting the mind and will . . . [and] a psychic effect which removes the subject thus injected from the scope of reality; so that the person so treated is removed from contact with his environment, he is not able to see and feel properly, he loses proper use of his eye-sight, his hearing and his sense of perception and his ability to withstand interrogation"; (4) that the police doctor willfully suppressed this information and information of the identity of hyoscine and scopolamine, of his knowledge of these things, and of his intention to inject the hyoscine for the purpose of producing in Townsend "a physiological and psychological state . . . susceptible to interrogation resulting in . . . confessions . . ."; (5) that the injection caused Townsend to confess; (6) that on the evening of January 1, immediately after the injection of scopolamine, petitioner confessed to three murders and one robbery other than the murder of Boone and the robbery of Anagnost. Although there was some mention of other confessions at the trial, only the confession to the Anagnost robbery was specifically testified to.

Initially, in their answer, respondents stated: "Respondents admit the factual allegations of the petition well pleaded, but deny that Petitioner is held in custody by Respondents in violation of the constitution or laws of the United States . . . ." However, in the course of the first argument before the District Court it appeared that respondents admitted nothing alleged in the petition but merely took the position that the petition, on its face, was insufficient to entitle Townsend either to a hearing or to his release. In the course of the second argument, after the remand by this Court, respondents admitted

that "if the allegations of the petition are taken as true, then the petitioner is entitled to the relief he seeks . . . ," and that Townsend had confessed to at least five crimes after the injection of hyoscine. But respondents denied that "petitioner was adversely influenced by its [the hyoscine's] administration to the extent that his confession was obtained involuntarily"; that "Hyoscine is the truth serum"; that "the police surgeon or the prosecution concealed pertinent, material and relevant facts"; or that hyoscine was an improper medication under the circumstances. Despite respondents' concession that a dispute as to these facts existed, the district judge denied Townsend the opportunity to call witnesses or to produce other evidence in support of his allegations and dismissed the petition.

Before we granted the most recent petition for certiorari we requested respondents to submit an additional response directed to certain of the allegations of the petition for habeas corpus. Respondents submitted an "additional answer to petition for habeas corpus" in which they again admitted that Townsend had made confessions immediately after the injection of drugs. Specifically they admitted that petitioner confessed to the robberies of Anagnost and one Joseph Martin and to the murders of Boone, Thomas Johnson, Johnny Stinson, and Willis Thompson. The additional answer revealed the following additional information respecting Townsend's confessions to these crimes. Anagnost had identified another person, rather than petitioner, as his assailant. Thomas Johnson, before his death, had stated that his injury had been an accident. The Assistant State's Attorney did not even bother to transcribe Townsend's statement with respect to Thompson's murder "because the defendant could not recall the details of the assault which led to the death . . . ." At the Thompson coroner's inquest, when

the deputy coroner noted that Townsend was then unable to remember even that he had committed the crime, Officer Cagney complained: "Why shouldn't we be given credit for these Clean-ups." Despite these circumstances which made conviction for the Anagnost robbery and the Johnson and Thompson murders, at best, a remote possibility, petitioner was indicted for all of the crimes to which he had confessed. However, after a jury trial, he was acquitted of the murder of Johnny Stinson, and on the very day that he was sentenced to death for the Boone murder, on the motion of the prosecutor, the indictments for the murders of Johnson and Thompson and for the robberies of Anagnost and Martin were dismissed.

Although the petition for habeas corpus contains allegations which would constitute a claim that the police doctor, at the trial, had perjured himself, the heart of Townsend's claim is that his confession was inadmissible simply because it was caused by the injection of hyoscine. We must first determine whether petitioner's allegations, if proved, would establish the right to his release.

## I.

Numerous decisions of this Court have established the standards governing the admissibility of confessions into evidence. If an individual's "will was overborne" [2] or if his confession was not "the product of a rational intellect and a free will," [3] his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a drug-induced statement. It is difficult to imagine a situation in which a confession would be less the product of a free intellect, less voluntary, than when brought

---

[2] *Reck* v. *Pate,* 367 U. S. 433, 440.

[3] *Blackburn* v. *Alabama,* 361 U. S. 199, 208.

about by a drug having the effect of a "truth serum." [4]   It is not significant that the drug may have been administered and the questions asked by persons unfamiliar with hyoscine's properties as a "truth serum," if these properties exist.   Any questioning by police officers which *in fact* produces a confession which is not the product of a free intellect renders that confession inadmissible. [5]   The

---

[4] Of course, there are many relevant circumstances in this case which a district judge would be required to consider in determining whether the injection of scopolamine caused Townsend to confess. Among these are his lack of counsel at the time, his drug addiction, the fact that he was a "near mental defective," and his youth and inexperience.

[5] Respondents do not dispute this.   In fact at the time of the second argument before the District Court respondents stated:

"If it was a fact—to put it very bluntly as we will very shortly, and elaborate upon it—if a truth serum was administered to the petitioner and he was influenced by the truth serum and gave an involuntary confession, upon which his conviction was obtained, then that is it."

It is at least generally recognized that the administration of sufficient doses of scopolamine will break down the will.   Thus, it is stated in The Dispensatory of the United States (25th ed. 1955) 1223: "Many persons are excessively susceptible to scopolamine and toxic symptoms may occur; such symptoms are often very alarming. There are marked disturbances of intellection, ranging from complete disorientation to an active delirium . . . ."   The early literature on the subject designated scopolamine as a "truth serum."   It was thought to produce true confessions by criminal suspects.   *E. g.,* House, Why Truth Serum Should be Made Legal, 42 Medico-Legal Journal 138 (1925).   And as recently as 1940 Dean Wigmore suggested that scopolamine might be useful in criminal interrogation.   3 Wigmore on Evidence (3d ed. 1940) § 998, at 642.   However, some more recent commentators suggest that scopolamine's use is not likely to produce true confessions.   On the contrary it is said:

"Unfortunately, persons under the influence of drugs are very suggestible and may confess to crimes which they have not committed. False or misleading answers may be given, especially when questions are improperly phrased.   For example, if the police officer asserted in a confident tone 'You did steal the money, didn't you?', a

Court has usually so stated the test. See, *e. g., Stroble* v. *California,* 343 U. S. 181, 190: "If the confession which petitioner made . . . was in fact involuntary, the conviction cannot stand . . . ." And in *Blackburn* v. *Alabama,* 361 U. S. 199, we held irrelevant the absence of evidence of improper purpose on the part of the questioning officers. There the evidence indicated that the interrogating officers thought the defendant sane when he confessed, but we judged the confession inadmissible because the probability was that the defendant was in fact insane at the time.

Thus we conclude that the petition for habeas corpus alleged a deprivation of constitutional rights. The remaining question before us then is whether the District Court was required to hold a hearing to ascertain the facts which are a necessary predicate to a decision of the ultimate constitutional question.

The problem of the power and duty of federal judges, on habeas corpus, to hold evidentiary hearings—that is, to try issues of fact [6] anew—is a recurring one. The Court last dealt at length with it in *Brown* v. *Allen,* 344 U. S. 443, in opinions by Justices Reed and Frankfurter, both speaking for a majority of the Court. Since then,

---

suggestible suspect might easily give a false affirmative answer." MacDonald, Truth Serum, 46 J. Crim. L. 259, 259–260 (1955). We make no findings as to either the medical properties of scopolamine or the likely effect of the dosage administered to Townsend. However, whether scopolamine produces true confessions or false confessions, if it in fact caused Townsend to make statements, those statements were constitutionally inadmissible.

[6] By "issues of fact" we mean to refer to what are termed basic, primary, or historical facts: facts "in the sense of a recital of external events and the credibility of their narrators . . . ." *Brown* v. *Allen,* 344 U. S. 443, 506 (opinion of Mr. Justice Frankfurter). So-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense.

we have but touched upon it.[7]  We granted certiorari in the 1959 Term to consider the question, but ultimately disposed of the case on a more immediate ground. *Rogers* v. *Richmond,* 365 U. S. 534, 540.  It has become apparent that the opinions in *Brown* v. *Allen, supra,* do not provide answers for all aspects of the hearing problem for the lower federal courts, which have reached widely divergent, in fact often irreconcilable, results.[8] We mean to express no opinion on the correctness of particular decisions.  But we think that it is appropriate at this time to elaborate the considerations which ought properly to govern the grant or denial of evidentiary hearings in federal habeas corpus proceedings.

## II.

The broad considerations bearing upon the proper interpretation of the power of the federal courts on habeas corpus are reviewed at length in the Court's opinion in *Fay*

---

[7] See *Thomas* v. *Arizona,* 356 U. S. 390; *Rogers* v. *Richmond,* 357 U. S. 220 (denial of certiorari with accompanying statement) ; *United States ex rel. Jennings* v. *Ragen,* 358 U. S. 276 (*per curiam*); *Townsend* v. *Sain,* 359 U. S. 64 (*per curiam*) (vacating judgment on authority of *Jennings* v. *Ragen, supra*).

[8] See, *e. g., United States ex rel. Tillery* v. *Cavell,* 294 F. 2d 12 (C. A. 3d Cir.) ; *Schlette* v. *People,* 284 F. 2d 827 (C. A. 9th Cir.) ; *Bolling* v. *Smyth,* 281 F. 2d 192 (C. A. 4th Cir.) ; *Chavez* v. *Dickson,* 280 F. 2d 727 (C. A. 9th Cir.) ; *Gay* v. *Graham,* 269 F. 2d 482 (C. A. 10th Cir.) ; *United States ex rel. Rogers* v. *Richmond,* 252 F. 2d 807 (C. A. 2d Cir.), cert. denied with accompanying statement, 357 U. S. 220; *United States ex rel. Alvarez* v. *Murphy,* 246 F. 2d 871 (C. A. 2d Cir.) ; *Tyler* v. *Pepersack,* 235 F. 2d 29 (C. A. 4th Cir.) ; *Cranor* v. *Gonzales,* 226 F. 2d 83 (C. A. 9th Cir.) ; *United States ex rel. De Vita* v. *McCorkle,* 216 F. 2d 743 (C. A. 3d Cir.).  See also Note, Habeas Corpus: Developments Since Brown v. Allen: A Survey and Analysis, 53 Nw. U. L. Rev. 765; Comment, Federal Habeas Corpus Review of State Convictions: An Interplay of Appellate Ambiguity and District Court Discretion, 68 Yale L. J. 98.

v. *Noia, post,* p. 391, and need not be repeated here. We pointed out there that the historic conception of the writ, anchored in the ancient common law and in our Constitution as an efficacious and imperative remedy for detentions of fundamental illegality, has remained constant to the present day. We pointed out, too, that the Act of February 5, 1867, c. 28, § 1, 14 Stat. 385–386, which in extending the federal writ to state prisoners described the power of the federal courts to take testimony and determine the facts *de novo* in the largest terms, restated what apparently was the common-law understanding. *Fay* v. *Noia, post,* p. 416, n. 27. The hearing provisions of the 1867 Act remain substantially unchanged in the present codification. 28 U. S. C. § 2243. In construing the mandate of Congress, so plainly designed to afford a trial-type proceeding in federal court for state prisoners aggrieved by unconstitutional detentions, this Court has consistently upheld the power of the federal courts on habeas corpus to take evidence relevant to claims of such detention. "Since *Frank* v. *Mangum,* 237 U. S. 309, 331, this Court has recognized that habeas corpus in the federal courts by one convicted of a criminal offense is a proper procedure 'to safeguard the liberty of all persons within the jurisdiction of the United States against infringement through any violation of the Constitution,' even though the events which were alleged to infringe did not appear upon the face of the record of his conviction." *Hawk* v. *Olson,* 326 U. S. 271, 274. *Brown* v. *Allen* and numerous other cases have recognized this.

The rule could not be otherwise. The whole history of the writ—its unique development—refutes a construction of the federal courts' habeas corpus powers that would assimilate their task to that of courts of appellate review. The function on habeas is different. It is to test by way of an original civil proceeding, independent of the normal

channels of review of criminal judgments, the very gravest allegations. State prisoners are entitled to relief on federal habeas corpus only upon proving that their detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution. Simply because detention so obtained is intolerable, the opportunity for redress, which presupposes the opportunity to be heard, to argue and present evidence, must never be totally foreclosed. See *Frank* v. *Mangum,* 237 U. S. 309, 345–350 (dissenting opinion of Mr. Justice Holmes). It is the typical, not the rare, case in which constitutional claims turn upon the resolution of contested factual issues. Thus a narrow view of the hearing power would totally subvert Congress' specific aim in passing the Act of February 5, 1867, of affording state prisoners a forum in the federal trial courts for the determination of claims of detention in violation of the Constitution. The language of Congress, the history of the writ, the decisions of this Court, all make clear that the power of inquiry on federal habeas corpus is plenary. Therefore, where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew.

## III.

We turn now to the considerations which in certain cases may make exercise of that power mandatory. The appropriate standard—which must be considered to supersede, to the extent of any inconsistencies, the opinions in *Brown* v. *Allen*—is this: Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required

unless the state-court trier of fact has after a full hearing reliably found the relevant facts.[9]

It would be unwise to overly particularize this test. The federal district judges are more intimately familiar with state criminal justice, and with the trial of fact, than are we, and to their sound discretion must be left in very large part the administration of federal habeas corpus. But experience proves that a too general standard—the "exceptional circumstances" and "vital flaw" tests of the opinions in *Brown* v. *Allen*—does not serve adequately to explain the controlling criteria for the guidance of the federal habeas corpus courts. Some particularization may therefore be useful. We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

(1) There cannot even be the semblance of a full and fair hearing unless the state court actually reached and

---

[9] In announcing this test we do not mean to imply that the state courts are required to hold hearings and make findings which satisfy this standard, because such hearings are governed to a large extent by state law.

The existence of the exhaustion of state remedies requirement (announced in *Ex parte Royall*, 117 U. S. 241, and now codified in 28 U. S. C. § 2254) lends support to the view that a federal hearing is not always required. It presupposes that the State's adjudication of the constitutional issue can be of aid to the federal court sitting in habeas corpus.

decided the issues of fact tendered by the defendant. Thus, if no express findings of fact have been made by the state court, the District Court must initially determine whether the state court has impliedly found material facts. No relevant findings have been made unless the state court decided the constitutional claim tendered by the defendant on the merits. If relief has been denied in prior state collateral proceedings after a hearing but without opinion, it is often likely that the decision is based upon a procedural issue—that the claim is not collaterally cognizable—and not on the merits. On the other hand, if the prior state hearing occurred in the course of the original trial—for example, on a motion to suppress allegedly unlawful evidence, as in the instant case—it will usually be proper to assume that the claim was rejected on the merits.

If the state court has decided the merits of the claim but has made no express findings, it may still be possible for the District Court to reconstruct the findings of the state trier of fact, either because his view of the facts is plain from his opinion or because of other indicia. In some cases this will be impossible, and the Federal District Court will be compelled to hold a hearing.

Reconstruction is not possible if it is unclear whether the state finder applied correct constitutional standards in disposing of the claim. Under such circumstances the District Court cannot ascertain whether the state court found the law or the facts adversely to the petitioner's contentions. Since the decision of the state trier of fact may rest upon an error of law rather than an adverse determination of the facts, a hearing is compelled to ascertain the facts. Of course, the possibility of legal error may be eliminated in many situations if the fact finder has articulated the constitutional standards which he has applied. Furthermore, the coequal responsibilities of state and federal judges in the administration of federal

constitutional law are such that we think the district judge may, in the ordinary case in which there has been no articulation, properly assume that the state trier of fact applied correct standards of federal law to the facts, in the absence of evidence, such as was present in *Rogers* v. *Richmond,* that there is reason to suspect that an incorrect standard was in fact applied.[10] Thus, if third-degree methods of obtaining a confession are alleged and the state court refused to exclude the confession from evidence, the district judge may assume that the state trier found the facts against the petitioner, the law being, of course, that third-degree methods necessarily produce a coerced confession.

In any event, even if it is clear that the state trier of fact utilized the proper standard, a hearing is sometimes required if his decision presents a situation in which the "so-called facts and their constitutional significance [are] . . . so blended that they cannot be severed in consideration." *Rogers* v. *Richmond, supra,* at 546. See *Frank* v. *Mangum, supra,* at 347 (Holmes, J., dissenting). Unless the district judge can be reasonably certain that the state trier would have granted relief if he had believed petitioner's allegations, he cannot be sure that the state trier in denying relief disbelieved these allegations. If any combination of the facts alleged would prove a violation of constitutional rights and the issue of law on those facts presents a difficult or novel problem for decision, any hypothesis as to the relevant factual determinations of the state trier involves the purest speculation. The fed-

---

[10] Of course, under *Rogers* v. *Richmond,* a new trial is required if the trial judge or the jury, in finding the facts, has been guided by an erroneous standard of law. However, there will be situations in which statements of the trier of fact will do no more than create doubt as to whether the correct standard has been applied. In such situations a District Court hearing to determine the constitutional issue will be necessary.

eral court cannot exclude the possibility that the trial judge believed facts which showed a deprivation of constitutional rights and yet (erroneously) concluded that relief should be denied. Under these circumstances it is impossible for the federal court to reconstruct the facts, and a hearing must be held.

(2) This Court has consistently held that state factual determinations not fairly supported by the record cannot be conclusive of federal rights. *Fiske* v. *Kansas*, 274 U. S. 380, 385; *Blackburn* v. *Alabama*, 361 U. S. 199, 208–209. Where the fundamental liberties of the person are claimed to have been infringed, we carefully scrutinize the state-court record. See, *e. g., Blackburn* v. *Alabama, supra; Moore* v. *Michigan*, 355 U. S. 155. The duty of the Federal District Court on habeas is no less exacting.

(3) However, the obligation of the Federal District Court to scrutinize the state-court findings of fact goes farther than this. Even if all the relevant facts were presented in the state-court hearing, it may be that the fact-finding procedure there employed was not adequate for reaching reasonably correct results. If the state trial judge has made serious procedural errors (respecting the claim pressed in federal habeas) in such things as the burden of proof, a federal hearing is required. Even where the procedure employed does not violate the Constitution, if it appears to be seriously inadequate for the ascertainment of the truth, it is the federal judge's duty to disregard the state findings and take evidence anew. Of course, there are procedural errors so grave as to require an appropriate order directing the habeas applicant's release unless the State grants a new trial forthwith. Our present concern is with errors which, although less serious, are nevertheless grave enough to deprive the state evidentiary hearing of its adequacy as a means of finally determining facts upon which constitutional rights depend.

(4) Where newly discovered evidence is alleged in a habeas application, evidence which could not reasonably have been presented to the state trier of facts, the federal court must grant an evidentiary hearing. Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus. Also, the district judge is under no obligation to grant a hearing upon a frivolous or incredible allegation of newly discovered evidence.

(5) The conventional notion of the kind of newly discovered evidence which will permit the reopening of a judgment is, however, in some respects too limited to provide complete guidance to the federal district judge on habeas. If, for any reason not attributable to the inexcusable neglect of petitioner, see *Fay* v. *Noia, post,* p. 438 (Part V), evidence crucial to the adequate consideration of the constitutional claim was not developed at the state hearing, a federal hearing is compelled. The standard of inexcusable default set down in *Fay* v. *Noia* adequately protects the legitimate state interest in orderly criminal procedure, for it does not sanction needless piecemeal presentation of constitutional claims in the form of deliberate by-passing of state procedures. Compare *Price* v. *Johnston,* 334 U. S. 266, 291: "The primary purpose of a *habeas corpus* proceeding is to make certain that a man is not unjustly imprisoned. And if for some justifiable reason he was previously unable to assert his rights or was unaware of the significance of relevant facts, it is neither necessary nor reasonable to deny him all opportunity of obtaining judicial relief."

(6) Our final category is intentionally open-ended because we cannot here anticipate all the situations wherein a hearing is demanded. It is the province of the district judges first to determine such necessities in ac-

cordance with the general rules. The duty to try the facts anew exists in every case in which the state court has not after a full hearing reliably found the relevant facts.

## IV.

It is appropriate to add a few observations concerning the proper application of the test we have outlined.

*First.* The purpose of the test is to indicate the situations in which the holding of an evidentiary hearing is mandatory. In all other cases where the material facts are in dispute, the holding of such a hearing is in the discretion of the district judge. If he concludes that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, he may, and ordinarily should, accept the facts as found in the hearing. But he need not. In every case he has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim. There is every reason to be confident that federal district judges, mindful of their delicate role in the maintenance of proper federal-state relations, will not abuse that discretion. We have no fear that the hearing power will be used to subvert the integrity of state criminal justice or to waste the time of the federal courts in the trial of frivolous claims.

*Second.* Although the district judge may, where the state court has reliably found the relevant facts, defer to the state court's findings of fact, he may not defer to its findings of law. It is the district judge's duty to apply the applicable federal law to the state court fact findings independently. The state conclusions of law may not be given binding weight on habeas. That was settled in *Brown* v. *Allen, supra,* at 506 (opinion of Mr. Justice Frankfurter).

*Third.* A District Court sitting in habeas corpus clearly has the power to compel production of the complete state-court record. Ordinarily such a record—including the transcript of testimony (or if unavailable some adequate substitute, such as a narrative record), the pleadings, court opinions, and other pertinent documents—is indispensable to determining whether the habeas applicant received a full and fair state-court evidentiary hearing resulting in reliable findings. See *United States ex rel. Jennings* v. *Ragan,* 358 U. S. 276; *Townsend* v. *Sain,* 359 U. S. 64. Of course, if because no record can be obtained the district judge has no way of determining whether a full and fair hearing which resulted in findings of relevant fact was vouchsafed, he must hold one. So also, there may be cases in which it is more convenient for the district judge to hold an evidentiary hearing forthwith rather than compel production of the record. It is clear that he has the power to do so.

*Fourth.* It rests largely with the federal district judges to give practical form to the principles announced today. We are aware that the too promiscuous grant of evidentiary hearings on habeas could both swamp the dockets of the District Courts and cause acute and unnecessary friction with state organs of criminal justice, while the too limited use of such hearings would allow many grave constitutional errors to go forever uncorrected. The accommodation of these competing factors must be made on the front line, by the district judges who are conscious of their paramount responsibility in this area.

## V.

Application of the foregoing principles to the particular litigation before us is not difficult. Townsend received an evidentiary hearing at his original trial, where his confession was held to be voluntary. Having exhausted his

state remedies without receiving any further such hearing, he turned to the Federal District Court. Twice now, habeas corpus relief has been denied without an evidentiary hearing. On appeal from the second denial, the Court of Appeals held that "[o]n habeas corpus, the district court's inquiry is limited to a study of the *undisputed* portions of the record." That formulation was error. And we believe that on this record it was also error to refuse Townsend an evidentiary hearing in the District Court. The state trial judge rendered neither an opinion, conclusions of law, nor findings of fact. He made no charge to the jury setting forth the constitutional standards governing the admissibility of confessions. In short, there are no indicia which would indicate whether the trial judge applied the proper standard of federal law in ruling upon the admissibility of the confession. The Illinois Supreme Court opinion rendered at the time of direct appeal contains statements which might indicate that the court thought the confession was admissible if it satisfied the "coherency" standard. Under that test the confession would be admissible "[s]o long as the accused [was] . . . capable of making a narrative of past events or of stating his own participation in the crime . . . ." 11 Ill. 2d, at 43, 141 N. E. 2d, at 736. As we have indicated in Part I of this opinion, this test is not the proper one. Possibly the state trial judge believed that the admissibility of allegedly drug-induced confessions was to be judged by the "coherency" standard.[11] However, even if this possibility could be eliminated, and it could be ascertained

---

[11] The charge to the jury dealt only with the issues of credibility so far as the confession was concerned. Even accepting the relevance of the instructions, there is nothing in the charge to the jury to show that the trial judge, like the Supreme Court, did not think that voluntariness was conclusively established by a showing that the defendant was coherent.

that correct standards of law were applied, it is still unclear whether the state trial judge would have excluded Townsend's confession as involuntary if he had believed the evidence which Townsend presented at the motion to suppress. The problem which the trial judge faced was novel and by no means without difficulty. We believe that the Federal District Court could not conclude that the state trial judge admitted the confession because he disbelieved the evidence which would show that it was involuntary. We believe that the findings of fact of the state trier could not be successfully reconstructed. We hold that, for this reason, an evidentiary hearing was compelled.[12]

Furthermore, a crucial fact was not disclosed at the state-court hearing: that the substance injected into Townsend before he confessed has properties which may trigger statements in a legal sense involuntary.[13] This fact was vital to whether his confession was the product of a free will and therefore admissible. To be sure, there was medical testimony as to the general properties of hyoscine, from which might have been inferred the con-

---

[12] The dissent fails to say why a hearing was not required for this reason. And "accepting the Court's . . . hearing standards" as the dissent does, it cannot seriously be argued that a hearing was not compelled. True the state trial judge instructed the jury that it *could* disregard the confession on grounds of credibility if it believed the petitioner's expert. But this hardly indicates whether the trial judge, at the motion to suppress, himself disbelieved the expert or whether he thought that, notwithstanding the truth of the expert's testimony, the confession was voluntary.

[13] It appears that at the suppression hearing it was not disclosed that hyoscine (the substance injected, along with phenobarbital, into Townsend) was identical to scopolamine, and neither was it disclosed that scopolamine is familiarly known as "truth serum." Later on in the trial, there was testimony that hyoscine is identical to scopolamine, but not that scopolamine (or hyoscine) is a "truth serum."

clusion that Townsend's power of resistance had been debilitated. But the crucially informative characterization of the drug, the characterization which would have enabled the judge and jury, mere laymen, intelligently to grasp the nature of the substance under inquiry, was inexplicably omitted from the medical experts' testimony. Under the circumstances, disclosure of the identity of hyoscine as a "truth serum" was indispensable to a fair, rounded, development of the material facts. And the medical experts' failure to testify fully cannot realistically be regarded as Townsend's inexcusable default. See *Fay* v. *Noia, post,* p. 438 (Part V).

On the remand it would not, of course, be sufficient for the District Court merely to hear new evidence and to read the state-court record. Where an unresolved factual dispute exists, demeanor evidence is a significant factor in adjudging credibility. And questions of credibility, of course, are basic to resolution of conflicts in testimony. To be sure, the state-court record is competent evidence,[14] and either party may choose to rely solely upon the evidence contained in that record, but the petitioner, and the State, must be given the opportunity to present other testimonial and documentary evidence relevant to the disputed issues. This was not done here.

In deciding this case as we do, we do not mean to prejudge the truth of the allegations of the petition for habeas corpus. We decide only that on this record the federal district judge was obliged to hold a hearing.

*Reversed and remanded.*

MR. JUSTICE GOLDBERG, concurring.

I join in the opinion and judgment of the Court and add a few words by way of comment on the dissenting opinion of my Brother STEWART.

[14] Cf. 28 U. S. C. §§ 2245, 2247.

I cannot agree with MR. JUSTICE STEWART that the instructions given to the jury by the trial judge on the issue of credibility indicate the application of a proper constitutional test to measure the voluntariness—and hence the admissibility—of the petitioner's disputed confession of the Boone murder. In my view, the very portions of the instructions excerpted by my Brother STEWART support, if anything, the contrary conclusion that an improper and constitutionally impermissible standard was utilized by the trial judge himself in the suppression hearing.

If, as suggested by my Brother STEWART, these instructions are taken to evidence the exclusionary standard applied by the trial judge in ruling on the petitioner's motion to suppress, they reflect error of constitutional dimension, as does the standard of admissibility contained in the affirming opinion of the Illinois Supreme Court. While the appellate court, as pointed out in the opinion of THE CHIEF JUSTICE, see *ante,* pp. 319–321, appears to have adopted a test of "coherency" to measure the admissibility of the confession, the trial court seemingly concluded that inducement of amnesia was a prerequisite to disregard of the confession. Both standards, whether or not intended to incorporate similar elements, fail to conform to the requisite test.

The third paragraph of the instructions quoted by my Brother STEWART in footnote 2, *post,* p. 330, advises the jury that it might discount the confession if it found that administration of the drug caused the petitioner to "lose his memory," to suffer "a state of amnesia" during the period of questioning, *and* to be unable "to control his answers or to assert his will by denying the crime charged." By use of the conjunctive to incorporate the requirement of loss of control, this instruction indicates the trial court's apparent view that if the drug had the effect of overbearing the petitioner's will but did not also cause loss of

memory, the confession would nonetheless remain acceptable evidence of guilt. This conclusion is buttressed by the instruction quoted in the concluding paragraph of note 2 in my Brother STEWART's dissenting opinion, in which the trial court indicates that the confession might be disregarded by the jury not simply if the drug had the effect asserted by the petitioner's expert in response to a hypothetical question, but only if, *in addition,* the drug so affected the petitioner's consciousness that "he did not know what he was doing." The petitioner may have been fully aware of what he was doing in confessing and may have suffered no loss of memory, but that is not the issue. The crucial question, and the measure of evidentiary propriety under the Constitution, is whether the drug—whatever label was or was not affixed to it—so overbore the petitioner's will that he was unable to resist confessing. Whether or not he was conscious of what he was doing, the petitioner could, because of the drug, have been wholly unable to stop himself from admitting guilt.*

In the absence of contrary indications, I think we must recognize that the misconception of the constitutional standard evidenced by these instructions may well have infected the trial judge's ruling at the suppression hearing. The inference of error is not negatived by the remainder of the instructions, which permit disregard of the confession if induced by force, physical or mental, duress, or promise of reward. In the context of the instructions as a whole, these references to "voluntariness" do not meet the problems raised by the administration of the drug to the petitioner and do not vitiate the crucial inference that

---

*The petitioner's initial resistance to admitting guilt, his sudden change in attitude, and the veritable flood of confessions succeeding immediately upon administration of the drug to him, see *ante,* pp. 306–307, all indicate the real possibility that his will was so overborne. Moreover, the reliability of a number of these confessions is seriously impaired. See *ibid.*

the trial judge viewed exclusion as dependent upon the presence of facts in addition to a drug-induced sterilization of the petitioner's will.

For the reasons contained in the opinion of the Court, and on the basis of what I believe to be the wholly fair inference that the trial court misconceived the proper constitutional measure of admissibility of the petitioner's confession, the lack of any indication that the trial court did utilize the correct test, and the state appellate court's apparent application of a similarly erroneous standard, I agree that a hearing must be held below.

Finally, the Court's opinion does not warrant my Brother STEWART's criticism as to the propriety or wisdom of articulating standards to govern the grant of evidentiary hearings in habeas corpus proceedings. The setting of certain standards is essential to disposition of this case and a definition of their scope and application is an appropriate exercise of this Court's adjudicatory obligations. Particularly when, as here, the Court is directing the federal judiciary as to its role in applying the historic remedy in a difficult and sensitive area involving large issues of federalism, the careful discharge of our function counsels that, "in order to preclude individualized enforcement of the Constitution in different parts of the Nation, [we] . . . lay down as specifically as the nature of the problem permits the standards or directions that should govern the District Judges in the disposition of applications for habeas corpus by prisoners under sentence of State courts." *Brown* v. *Allen,* 344 U. S. 443, 501–502 (separate opinion of Mr. Justice Frankfurter).

MR. JUSTICE STEWART, whom MR. JUSTICE CLARK, MR. JUSTICE HARLAN, and MR. JUSTICE WHITE join, dissenting.

The basis for my disagreement with the Court can perhaps best be explained if I define at the outset the several areas in which I am entirely in accord with the Court's

opinion. First, as to the underlying issue of constitutional law, I completely agree that a confession induced by the administration of drugs is constitutionally inadmissible in a criminal trial. Secondly, I agree that the Court of Appeals in this case stated an erroneous standard when it said that "[o]n habeas corpus, the district court's inquiry is limited to a study of the *undisputed* portions of the record. . . ." 276 F. 2d 324, 329. Thirdly, I agree that where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the *power* to receive evidence and try the facts anew.[1]

I differ with the Court's disposition of this case in two important respects. First, I strongly doubt the wisdom of using this case—or any other—as a vehicle for cataloguing in advance a set of standards which are inflexibly to compel district judges to grant evidentiary hearings in habeas corpus proceedings. Secondly, I think that a *de novo* evidentiary hearing is not required in the present case, even under the very standards which the Court's opinion elaborates.

## I.

I have no quarrel with the Court's statement of the basic governing principle which should determine whether a hearing is to be had in a federal habeas corpus

---

[1] Indeed, the original version of 28 U. S. C. § 2243 directed the court to "proceed in a summary way to *determine the facts* of the case, *by hearing the testimony* and arguments, and thereupon to dispose of the party as law and justice require." See *Walker* v. *Johnston,* 312 U. S. 275, 283–284. (Emphasis added.) The statute was later revised so that it now provides that "The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." The Revisers' notes indicate that the change was one of "phraseology" and not substance.

Where the state court has reliably found facts relevant to any issue, the district judge in such a hearing should, of course, give appropriate deference to such findings. See *ante*, p. 318.

proceeding: "Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." *Ante,* p. 312. But the Court rightly says that "[i]t would be unwise to overly particularize this test," and I think that in attempting to erect detailed hearing standards for the myriad situations presented by federal habeas corpus applications, the Court disregards its own wise admonition.

The Court has done little more today than to supply new phrases—imprecise in scope and uncertain in meaning—for the habeas corpus vocabulary of District Court judges. And because they purport to establish mandatory requirements rather than guidelines, the tests elaborated in the Court's opinion run the serious risk of becoming talismanic phrases, the mechanistic invocation of which will alone determine whether or not a hearing is to be had.

More fundamentally, the enunciation of an elaborate set of standards governing habeas corpus hearings is in no sense required, or even invited, in order to decide the case before us, and the many pages of the Court's opinion which set these standards forth cannot, therefore, be justified even in terms of the normal function of dictum. The reasons for the rule against advisory opinions which purport to decide questions not actually in issue are too well established to need repeating at this late date. See, *e. g., Marine Cooks* v. *Panama S. S. Co.,* 362 U. S. 365, 368, n. 5; *Machinists Local* v. *Labor Board,* 362 U. S. 411, 415, n. 5. I regard these reasons as peculiarly persuasive in the present context. We should not try to hedge in with inflexible rules what is essentially an extraordinary writ, designed to do justice in extraordinary and often unpredictable situations.

## II.

Even accepting the Court's detailed hearing standards *in toto,* however, I cannot agree that any one of them requires the District Court to hold a new evidentiary hearing in the present case. And I think, putting these rigid formulations to one side, that accepted principles governing the fair and prompt administration of criminal justice within our federal system affirmatively counsel *against* a *de novo* federal court hearing in this case.

The Court refers to two specific defects which it feels compel a hearing in the District Court: the absence of "indicia which would indicate whether the trial judge applied the proper standard of federal law in ruling upon the admissibility of the confession" and the fact that it was not disclosed in the state hearing that "the substance injected into Townsend before he confessed has properties which may trigger statements in a legal sense involuntary." Since the lengthy extracts from the testimony and pleadings in the Court's opinion do not seem to me to bear on these issues, it becomes necessary to sketch the prior proceedings in this case to indicate why I think the Court is mistaken in concluding that a new hearing is required.

During the early morning hours of January 1, 1954, the petitioner was arrested by the Chicago police. He admitted having given himself an injection of heroin 90 minutes before his arrest. Within an hour of his arrest, he was questioned for 30 minutes about various crimes, all of which he denied having committed. He was not questioned again until that evening.

Shortly after the evening questioning began, the petitioner complained of stomach pains and requested a doctor. A police surgeon was summoned, and he administered an injection consisting of 2 cc.'s of a saline solution in which 1/230 grain of hyoscine hydrobromide and ⅛

grain of phenobarbital were dissolved. Slightly more than an hour later, the petitioner confessed to the murder of Boone. The following day, 15 hours after the police surgeon had administered the hyoscine, the petitioner initialed a copy of his previous night's statement in the offices of the State's Attorney General. At the coroner's hearing on January 4, the petitioner again confessed to the Boone killing.

## A. THE STANDARD OF FEDERAL LAW APPLIED BY THE STATE TRIAL COURT IN RULING UPON THE ADMISSIBILITY OF THE CONFESSION.

At the trial, the petitioner's lawyer objected to introduction of the confession on the ground that it was involuntary. In accordance with Illinois practice, the motion to suppress was argued before the judge in the absence of the jury. During this proceeding, the petitioner testified that the injection had produced a temporary state of amnesia, that he could not remember making any confession, and that various other physical effects were produced. The police officers present at the petitioner's questioning stated that no change in the petitioner's demeanor suggesting any loss of his mental faculties had taken place as a result of the injection. On the question of the possible effects of the injection administered to the petitioner, Dr. Mansfield, the police surgeon and a licensed physician, testified for the State that he had treated thousands of narcotics addicts suffering from withdrawal symptoms, that in about 50% of such cases he had used the same treatment administered to the petitioner, and that he could recall no case in his experience where his use of hyoscine had produced loss of memory. A doctor of pharmacology (who was not a licensed physician) testified on behalf of the petitioner, and in answer to a hypothetical question stated that a person in the petitioner's condition at the time of interrogation could have

been suffering amnesia and partial loss of consciousness as the result of the treatment which had been administered to relieve the narcotic withdrawal symptoms. On cross-examination, this witness revealed that he had never actually seen the effects of hyoscine on a human and admitted that he was unfamiliar with its use in treating drug addicts. It is evident that a finder of fact could with reason have accorded more credibility to the evidence offered by the prosecution than to that offered by the defense.

It is true, as the Court today says, that in overruling the motion to suppress the confession, the trial judge did not explicitly spell out the exclusionary standards he was applying. The instructions to the jury at the end of the case, however, although directed to the question of credibility—since that was the issue before the jury under Illinois procedure—were couched in terms of voluntariness, and they clearly established that the trial judge was aware of the correct constitutional standards to be applied.[2]

---

[2] Among the instructions given were the following:

"There has been admitted into evidence a written confession alleged to have been made freely and voluntarily by the defendant.

"You are further instructed that a confession made freely and voluntarily by a person charged with a crime may be considered by you, but if you find from the evidence that any force, physically or mentally, has been exerted upon the defendant by those having the defendant in charge after his arrest in order to obtain a confession, or that those persons made any promises to reward him if he would make such a confession, then you may totally disregard such confession.

"You are further instructed that if you find from the evidence that the defendant was given drugs and that said drugs caused him to lose his memory and create a state of amnesia in the defendant during the questioning of this defendant by the police or State's Attorney and that the defendant was not able to control his answers or to assert his will by denying the crime charged, then you may totally disregard such confession.

"You are instructed that if you find from the evidence that any influence was used on the defendant which amounted to duress upon

Nothing in the record indicates that an incorrect standard was applied at the suppression hearing. Given these circumstances, I think it completely impermissible for us to assume that the trial judge did not apply "the proper standard of federal law in ruling upon the admissibility of the confession." Where, as here, a record is totally devoid of any indication that a state trial judge employed an erroneous constitutional standard, the presumption should surely be that the judge knew the law and correctly applied it. Certainly it is improper to presume that the trial judge did *not* know the law which the Constitution commands him to follow. Yet that is precisely the presumption which the Court makes in this case.

his mind or body which caused him to make the confession, then you may totally disregard the confession.

. . . . .

"You are further instructed that if you believe from the evidence in this case that duress or influence either physically or mentally, was exerted upon the defendant which caused him to make the written confession which has been introduced into evidence, then you may further consider whether this influence was still in existence at the time the defendant appeared at the coroner's inquest and is alleged to have made a confession there.

"There has been introduced into evidence the testimony of a witness, who is in the category known as an 'Expert Witness,' who testified as to what influence or effect certain drugs had upon a hypothetical person.

"You are further instructed that you may take this testimony into consideration in determining whether the drugs alleged to have been administered to the defendant by Dr. Mansfield would have the same effect upon the defendant that the drug in the opinion of the 'Expert Witness' had upon the hypothetical person, and if you believe from all the evidence in this case that the drugs had the effect upon the defendant to cause his consciousness to be impaired to the extent that he did not know what he was doing while he was being questioned by police officers or the Assistant State's Attorney, then you may totally disregard any statement or confession that he is alleged to have made during the time such influence, if any, was exerted upon him."

## B. DISCLOSURE OF THE "PROPERTIES" OF THE MEDICINE ADMINISTERED TO THE PETITIONER.

Much of the evidence which had been presented to the judge alone was subsequently brought before the jury by defense counsel in an attempt to diminish the weight to be given to the confession. Additional evidence was also adduced by the prosecution, including testimony by another licensed physician, who made clear that hyoscine was identical with scopolamine. The case was submitted to the jury under unexceptionable instructions,[3] and the petitioner was convicted and sentenced to death. The Illinois Supreme Court, after reviewing in detail the evidence bearing on the voluntariness of the confession, affirmed the conviction. 11 Ill. 2d 30, 141 N. E. 2d 729. This Court denied certiorari, 355 U. S. 850; rehearing denied, 355 U. S. 886.

The petitioner then instituted post-conviction proceedings in the state trial court. His claim in these proceedings was that the confession had been procured as a result of the administration of scopolamine, that the witnesses for the State were aware of the identity of scopolamine and hyoscine and had deliberately withheld the fact of this identity at trial, and that the petitioner had consequently not been afforded an opportunity to make clear the basis for his claim that his confession had been coerced. The trial court dismissed the petition, and the Supreme Court of Illinois affirmed. In an unpublished opinion, that court concluded as follows:

"A study of our opinion on [the original appeal] discloses that all of the evidence with respect to the injection of hyoscine and phenobarbital was carefully considered by us in resolving the issue of the validity of petitioner's confession. (People vs.

---

[3] See footnote 2, *supra.*

Townsend, 11 Ill. 2d, 30, 35, 44). Thus, it is clear that the issue of the effect of the drug on the confession was before us . . . . The only matter which was not presented then was the fact that hyoscine and scopolamine are identical. In an attempt to escape from the doctrine of *res judicata,* the present petition for a writ of error contends that this fact could not have been presented to us because it was unknown to petitioner and his counsel at the time. Assuming for the moment the truth of this statement, we are of the opinion that the mere fact that the drug which was administered to petitioner is known by two different names presents no constitutional issue. At the original trial there was extensive medical testimony as to the properties and effects of hyoscine. If hyoscine and scopolamine are, in fact, identical, the medical testimony as to these properties and effects would be the same, regardless of the name of the drug. In determining the effect of the drug on the validity of petitioner's confession, the vital issue was its nature and its effect, rather than its name. This issue was thoroughly presented, both in the trial court and in this Court. Furthermore, the claim by petitioner now that the State 'suppressed' this identity of hyoscine and scopolamine at the trial is destroyed by reference to the bill of exceptions from the original trial. A State medical witness, on cross-examination by petitioner's counsel stated: 'Scopolamine or hyoscine are the same.' "

Even under the detailed hearing requirements announced today by the Court, therefore, I think it is clear that the district judge had no choice but to conclude, on the basis of his examination of the full record of the state proceedings, that a new hearing on habeas corpus would

not be proper. For the record of the state proceedings clearly shows that the petitioner received a full and fair hearing as to the factual foundation for his constitutional claim—*i. e.*, as to the properties of the drug which had been administered to him and the circumstances surrounding his confession. A total of 3 medical experts and 17 lay witnesses testified. Their testimony was in conflict. The trial court determined upon this conflicting evidence that there was no factual basis for the petitioner's claim that his confession had been involuntary. There is nothing whatever in the record to support an inference that the trial court did not scrupulously apply a completely correct constitutional standard in determining that the confession was admissible.[4] The trial court's determination was fully reviewed by the Supreme Court of Illinois on appeal, and reviewed again in state post-conviction proceedings. To be sure, no witness at the trial used the phrase "truth serum"—a phrase which has no precise medical or scientific meaning. Yet I cannot but agree with the Supreme Court of Illinois that the mere fact that a drug may be known by more than one name hardly presents a constitutional issue.

Under our Constitution the State of Illinois has the power and duty to administer its own criminal justice. In carrying out that duty, Illinois must, as must each State, conform to the Due Process Clause of the Fourteenth Amendment. I think Illinois has clearly accorded the petitioner due process in this case. To require a federal court now to hold a new trial of factual claims which were long ago fully and fairly determined in the courts of Illinois is, I think, to frustrate the fair and prompt administration of criminal justice, to disrespect the fundamental structure of our federal system, and to debase the Great Writ of Habeas Corpus.

I would affirm.

---

[4] See pp. 330–331, *supra.*