**UNITED STATES of America ex rel. Lee WIGGINS**

v.

**COMMONWEALTH OF PENN-SYLVANIA.**

Misc. No. M–4200.

United States District Court
E. D. Pennsylvania.

Aug. 5, 1969.

James J. Orlow, Philadelphia, Pa., for relator.

Joseph J. Musto, Asst. Dist. Atty., Philadelphia, Pa., for commonwealth.

OPINION

KRAFT, District Judge.

Relator, a state prisoner, was convicted upon his plea of guilty, on April 23, 1964, to eleven bills of indictment charging him with aggravated robbery and related crimes. He was sentenced from five to ten years on two indictments and one to ten years on a third. All sentences were to run consecutively. On May 18, 1964, one of the five to ten year sentences was vacated and reduced to one to ten years.

In his present petition, relator alleges: (1) that his plea of guilty was not voluntarily made because he was then undergoing a psychomotor epileptic seizure; (2) that the state post-conviction judge failed to accord him a full and fair hearing on his petition.

The second ground is untenable, since it does not furnish a basis for federal habeas corpus relief. Any alleged inadequacies in the state post-conviction procedure are immaterial because the relator has been given a full and complete federal evidentiary hearing. Townsend v. Sain, 372 U.S. 293, 316, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

Relator also seeks to avail himself of the recent holding of the United States Supreme Court in Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (June 2, 1969), wherein the Court reversed the state court " 'because the record does not disclose that the defendant voluntarily and understandingly entered his pleas of guilty.' "

In reaching its decision, the Supreme Court cited and quoted with approval[1] the holding of the Pennsylvania Supreme Court in Com. ex rel. West v.

---

1. Slip opinion footnote 7.

Rundle, 428 Pa. 102, 105–106, 237 A.2d 196, 197 (1967) which reads as follows:

"A majority of criminal convictions are obtained after a plea of guilty. If these convictions are to be insulated from attack, the trial court is best advised to conduct an on the record examination of the defendant which should include, *inter alia*, an attempt to satisfy itself that the defendant understands the nature of the charges, his right to a jury trial, the acts sufficient to constitute the offenses for which he is charged and the permissible range of sentences."

In the instant case it is manifest from the record that no examination of the defendant was conducted by the trial court to ascertain whether the relator understandingly and voluntarily entered his pleas of guilty. However, the Pennsylvania Supreme Court has recently held that *West* is not to be applied retroactively,[2] Com. v. Cushnie, 433 Pa. 131, 249 A.2d 290 (Jan. 15, 1969) and that in all cases tried before *West* was decided the burden remained on the defendant to establish that he did not enter his guilty plea knowingly. "In fact, in Commonwealth v. Coleman, 430 Pa. 438, 243 A.2d 328 (1968), a case where the guilty plea was entered in 1965, after our decision in *Barnosky*,[3] we indicated that the burden of proof remained on the defendant."[4] Moreover, that the matter is one of credibility and the hearing judge may refuse to believe the defendant's version of what happened.

In *Boykin*, the United States Supreme Court referred to McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), which reversed a United States district judge, who accepted a guilty plea and failed to comply with Rule 11 of the Federal Criminal Rules. Subsequently, on May 5, 1969, in Halliday v. United States, 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16, the United States Supreme Court declined to apply *McCarthy*, retroactively and stated:

"We hold that only those defendants whose guilty pleas were accepted after April 2, 1969, are entitled to plead anew if their pleas were accepted without full compliance with Rule 11."

The rationale of *Halliday* was that the impact of retroactivity on the administration of justice outweighed the extent to which the condemned practice infected the integrity of the truth-determining process.

We fail to see any sound reason why the *Halliday* rationale should not be applied to *Boykin*, which unquestionably has a greater impact on the administration of state criminal justice than *McCarthy* would have on federal criminal procedure. Accordingly, we decline to apply *Boykin* retroactively.

As we have earlier indicated, the present relator's guilty plea was accepted by the Court without an on-the-record inquiry to determine its voluntariness. Pennsylvania holds that there is a rebuttable presumption that a defendant, who enters a guilty plea, understands the consequences of his act. Com. ex rel. Washington v. Maroney, 427 Pa. 599, 235 A.2d 349 (1967). Where the record discloses no inquiry by the trial judge prior to acceptance of the guilty plea,

---

2. Also, in Com. v. Godfrey, Pa., 254 A.2d 923 (June 27, 1969) the Pennsylvania Supreme Court declined to apply *Boykin* retroactively.

3. Com. ex rel. Barnosky v. Maroney, 414 Pa. 161, 199 A.2d 424 (1964).

4. But see, United States ex rel. Fink v. Rundle, 414 F.2d 542 (June 24, 1969) (guilty plea March 12, 1966) and United States ex rel. McCloud v. Rundle, 402 F.2d 853 (3 Cir. 1968) (guilty plea April 16, 1947) and United States ex rel. Crosby v. Brierley, 404 F.2d 790, 795–796 (3 Cir. Dec. 9, 1968) (guilty plea March 12, 1962) where the Court of Appeals applied *West* and *Barnosky* retroactively.

However, in *Cushnie* the Pennsylvania Supreme Court held that its language in *Barnosky* was merely "suggestive" and held that in trials occurring post-*Barnosky* and pre-*West* the burden of proof remained on the defendant to establish that his guilty plea was involuntary.

the presumption is of doubtful validity. United States ex rel. Crosby v. Rundle, supra 404 F.2d at p. 796 fn. 11.

We need not concern ourselves here about the obvious disagreement which exists as to whether the burden of proof shifts to the Commonwealth in due process attacks upon a guilty plea. This case differs materially from the usual assault upon the validity of a guilty plea, because this relator contends that he was rendered mentally incapable, by reason of an epileptic seizure, from comprehending the nature and effect of the very proceedings in which his guilty plea was entered. He specifically denies any knowledge of the proceedings and his willingness to plead guilty therein.

Relator's counsel, Robert Williams, Esq., did not testify at the federal habeas corpus hearing, because he had no present recollection of the trial and his representation of the relator. The District Attorney, pursuant to a stipulation of counsel, offered Mr. Williams' prior testimony at the state post-conviction hearing. (State n. t. pp. 5–26).

Mr. Williams recognized and recalled the relator, but had no recollection of specific conversations with him prior to the entry of a guilty plea. He testified that he could not recall anything unique or unusual about the relator's appearance or demeanor on the day of the entry of the guilty plea. (State n. t. 8).

Mr. Williams was only able to state that, *generally*, he explained to his clients, the consequences of a guilty plea, the maximum sentences possible under the law, and the alternatives available, such as, a not guilty plea with a jury trial or a trial by a judge. (State n. t. 12–14).

The relator's medical record reveals a history of epilepsy from the age of ten. While he was awaiting trial at the State Correctional Institution at Holmesburg, he was given anti-convulsant drugs for twenty-two days. On the day of his trial, however, he was not given the medication. This omission accorded with the common practice of the state court, designed and intended to avoid having a defendant considered incompetent because of the influence of drugs.

Dr. Hering, who is presently the Director of the Psychiatric Division of the Quarter Sessions Court, testified in support of the relator's claim. He was formerly Psychiatric Consultant to the State Correctional Institution in Philadelphia. He only treated relator *after* he was convicted and incarcerated at that institution.

Dr. Hering testified before us that the withdrawal of medication *most probably* caused the relator to have a psychomotor epileptic seizure rendering him incapable of entering a voluntary plea of guilty (Fed. n. t. 67–70). Dr. Hering opined that there was a "75, 80 or maybe 90 percent," probability that the relator had a psychomotor seizure. (Fed. n. t. 67). He explained that during such a seizure, relator would be "childlike" and his answers to questions would be "free of guile", because he would be trying to please everybody the way a child would; that the seizure would not be of a violent nature, but would be a stupor or fugue state of semiconsciousness; that such a seizure could last two, five, or ten minutes or as long as three days. (Fed. n. t. 68–72). Dr. Hering diagnosed relator's epileptic condition as being of a "mixed type" which connotes several types of seizures. (Fed. n. t. 71).

Relator's counsel also offered Dr. Hering's testimony given during the state post-conviction hearing. Although he there stated substantially the same ultimate conclusion, that the relator would be incapable of entering a voluntary plea of guilty while undergoing a psychomotor epileptic seizure, Dr. Hering was then notably less definite in his opinion as to actual occurrence of such a seizure on the day of the plea. (State n. t. p. 38).

"Q. He is saying that his trial should be set aside because he did not know what was going on; and are you, Doctor, in your opinion, trying to testify here to me today, before us today, that in view

of all this, this man did not know what was going on?"

"A. It is very possible; yes sir."

"Q. It is very possible?"

"A. I am not saying that it was."

"Q. Is it also possible from what you have heard in my relation of the notes of testimony from pages 9 through half of 13 that it is also possible that he did know what was going on?"

"A. Very possible."

The opinion given by Dr. Hering at the state court hearing was expanded at the federal hearing. He contended, inter alia, that when he said "very possible", he really meant "most probable."

The relator testified that all he remembered of the events attending his guilty plea was that he entered the van used to transport him to court and he remembers being in City Hall but he does not recall his "trial." He stated that the next thing he remembered was being incarcerated in a cell at this present place of confinement.

The notes of testimony (pp. 9–14) of relator's plea and sentencing reveal the following colloquy between the relator and his counsel:

"DEFENDANTS EVIDENCE

LEE WIGGINS, being duly sworn, was examined and testified as follows: BY MR. MILLIAMS:

Q. What is your full name?

A. Lee Wiggins.

Q. Where do you reside?

A. 48 North 51st Street.

Q. Philadelphia, Pennsylvania?

A. Yes, sir.

Q. You have entered a plea of guilty to these charges, carrying concealed deadly weapon and and aggravated robbery; is that correct?

A. Yes sir.

Q. I want you to keep your voice up so that his Honor can hear you. You were born when and where?

A. March 11, 1925, in Philadelphia, Pennsylvania.

Q. You are one of how many children?

A. Seven children.

Q. You are the fourth oldest; is that correct?

A. Yes, sir.

Q. You are how old at the present time?

A. 39 years old.

Q. You attended school where?

A. Philadelphia, Pennsylvania.

Q. What school?

A. James Alcorn and the Audenreid Junior High School.

Q. You went to what grade?

A. The eighth grade.

Q. Now, are you married?

A. Yes.

Q. Where were you married?

A. I was married in Wilmington, Delaware.

Q. Before a magistrate?

A. Before the mayor of Wilmington, Delaware.

Q. When was that?

A. April 17, 1963.

Q. Your wife is in court today?

A. Yes.

Q. You have been arrested several times prior to this?

A. Yes, sir.

Q. The last of which was for larceny of an automobile; is that correct?

A. Yes, sir.

Q. Prior to November, 1963, were you employed?

A. Yes, I was.

Q. Where were you employed?

A. Leon Paul's Panorama. (sic)

Q. Where is that?

A. 5025 Torresdale Avenue.

Q. What, if anything, did you do there?

A. I was a detail man and a sander.

Q. In the latter part of November, you took ill; is that correct?

A. Yes.

Q. What type of illness did you have?

A. I had pneumonia and I had a touch of ptomaine poisoning.

Q. You were treated at the University Hospital?

A. Philadelphia General Hospital.

Q. Philadelphia General Hospital?

A. Yes.

Q. Now, when you recuperated from your illness, what, if anything, happened with regard to your job?

A. When I recuperated I went back to my place of employment, and the fellow I was employed by had to lay off this other fellow and he could not give me my job back at the present time.

Q. Now, did you seek employment elsewhere?

A. Yes, I made application to various places.

Q. When you say you made application, did you make application to the City and County of Philadelphia?

A. Yes, I did.

Q. Did you take an examination?

A. Yes, I did.

Q. As a result of taking the examination, did you qualify to get a job with the city on the basis of your examination?

A. Yes, sir.

Q. At the time you made application for the job, did you tell them you had a criminal record?

A. Yes, sir.

Q. Were you subsequently notified that you were eligible for employment?

A. I was.

Q. Do you recall receiving a letter which stated you had a relatively high standing in the classes, all four classes?

A. Yes.

Q. Did you obtain the job?

A. No, sir; I went to Miss Richmond.

Q. She told you what?

A. I can't be employed by the City of Philadelphia.

Q. You cannot?

A. No, sir.

Q. What did you do?

A. I tried to fill out another application in a different type of job.

Q. You went into holdup and numbers?

A. Yes.

Q. You have had sufficient time to think of the things which you did; is that right?

A. Yes, sir.

Q. You realize you did wrong?

A. Yes.

Q. You realize you have to pay the penalty to society?

A. Yes sir.

Q. You understand that?

A. Yes, sir; I do.

Q. Your wife is in court?

A. Yes, sir.

AMELIA WIGGINS, being duly sworn, was examined and testified as follows:

Q. This gentlemen is your husband?

A. Yes.

Q. Where were you married?

A. Wilmington, Delaware.

Q. When were you married?

A. April 17, 1939.

Q. Was he a good husband to you?

A. Yes.

Q. Do you know why he should have been involved in these offenses?

A. They did not give him a chance.

Q. Is there anything which you know about him?

A. He did not have a chance for a decent job."

"THE COURT: The sentence on Bill 983 is not less than five nor more than ten years in the Eastern State Penitentiary, and you are referred to the Diagoistic Center of that institution. The sentence on Bill 984 is not less than five nor more than ten years in the Eastern State Penitentiary, and you are referred to the Diagnostic and Correctional Center of that institution, said sentence to commence at the end of sentence on Bill 983. On Bill 985, the sentence is not less than one nor more than ten years in the Eastern State Penitentiary, and you are referred to the Diagnostic Center of that institution to follow at the expiration of sentence on Bill 984. Sentence is suspended on the other bills.

At his federal hearing, relator stated that if he were being questioned today he would have pleaded not guilty: he would have testified that he was a painter and not a detail and sanderman and that he was treated at the University of Pennsylvania Hospital for his illnesses rather than at the Philadelphia General Hospital. (Fed. n. t. 16, 17).

The state court record is, of course, barren of any information about the relator's demeanor and appearance at the time of his plea and sentencing. Relator's wife testified at the federal hearing that she was present and observed the relator at the sentencing hearing. She stated that he was crying and mumbling during the proceedings and appeared to be on the verge of a collapse. However, she also testified that she spoke to relator after the sentencing and he told her that the sentence was *unfair*. (Fed. n. t. 38).

Essentially, the validity of the relator's claim depends, in large part, upon whether the Court believes his testimony that he was, in fact, rendered incompetent on the day of his plea and sentencing by reason of a psychomotor epileptic seizure. Doctor Hering admitted, necessarily, that he had no knowledge of relator's emotional or psychiatric condition on April 23, 1964. (State n. t. 26.). In fact, he stated that "on that particular day it would be impossible to know" to what degree relator was suffering from his epileptic condition (State n. t. 31). "He could have been perfectly normal that day. There were times when he was perfectly, you know, relatively normal." (State n. t. 32). "Oh, yes, absolutely. I certainly couldn't say anything on that particular day. I can only describe what I saw during the time I saw him." (State n. t. 33). Dr. Hering also testified that there were times when relator was taken off anti-convulsant drugs to see whether he would experience a convulsion and none reportedly occurred on the following day. (State n. t. 70). Additionally, Dr. Hering stated that what a person experiences during a psychomotor epileptic seizure is subjective in nature, although the illness itself has an organic basis in the brain. (State n. t. 45, 463).

We have thoroughly examined the complete state court record [5], which includes relator's medical history and treatment received since his confinement began. We observed the relator testify before us and carefully weighed his credibility. Tyler v. Beto, 391 F.2d 993 (5 Cir. 1968) cert. denied 393 U.S. 1030, 89 S.Ct. 642, 21 L.Ed.2d 574 (1969).

It is our considered judgment, after evaluating all of the evidence, that the relator was not incompetent at the time he entered his guilty plea. In reaching this conclusion we do not discount the medical testimony that the relator does, in fact, have epilepsy. However, we are not at all persuaded that he actually experienced a psychomotor seizure on the day of his plea and sentencing on April 23, 1964. The relator gave us the distinct impression that he was disingenuous and that his testimony was primarily motivated by strong self interest.

Accordingly, we enter the following

5. Townsend v. Sain, supra, 372 U.S. at p. 322, 83 S.Ct. 745, 9 L.Ed.2d 770.

## ORDER

Now, this 5th day of August, 1969, it is ordered that the relator's petition for a writ of habeas corpus is denied.

There is probable cause for an appeal.