Clarence Eugene **MIDDLEBROOKS, Jr.,**
Petitioner-Appellant,

v.

**UNITED STATES of America,**
Respondent-Appellee.

No. 73–4033.

United States Court of Appeals,
Fifth Circuit.

Sept. 27, 1974.
Rehearing Denied Nov. 5, 1974.

———

Calvin J. Faucett, Orlando, Fla., for petitioner-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Jeffry R. Jontz, Harrison T. Slaughter, Jr., Asst. U. S. Attys., Orlando, Fla., for respondent-appellee.

Before TUTTLE, WISDOM and GEE, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal from the denial of a federal prisoner's motion to vacate his sentence under 28 U.S.C. § 2255 presents the question whether this Court's apparent reliance on erroneous information contained in the government's brief so affected its decision to affirm the defendant's conviction on direct appeal that the defendant was denied due process of law. We affirm the denial of the defendant's section 2255 motion.

The defendant, Clarence Eugene Middlebrooks, Jr., was convicted of sixteen (16) counts of mail fraud in violation of 18 U.S.C. § 1341, following a jury trial in which he waived counsel and represented himself. The trial court sentenced him to two years imprisonment and fined him $4000 on eight counts. He was given a suspended sentence and a total probationary period of five years to run consecutively to the sentence of imprisonment imposed on count five. This Court affirmed the conviction, 431 F.2d 299 and the Supreme Court denied certiorari, 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622. Subsequently, while in custody the defendant filed his first section 2255 motion challenging his waiver of counsel at trial, among other issues. This motion was denied by the sentencing court on August 24, 1971 and affirmed by this Court, 457 F.2d 657. Once again the Supreme Court denied certiorari, 409 U.S. 848, 93 S.Ct. 55, 34 L.Ed.2d 90.

On March 6, 1972 the defendant filed the Motion to Vacate Judgment and Sentence pursuant to 28 U.S.C. § 2255 which is now under consideration by this Court. On October 26, 1973 the District Court for the Middle District of Florida denied the motion and defendant brings this appeal from that order.

The defendant originally argued three issues in his March 6, 1972 section 2255 motion. The first two, one concerning allegedly illegal wiretaps and the other concerning allegedly inadequate counsel on appeal, were properly found to be without merit by the trial court and are not before us today. The last concerned alleged erroneous information contained in the government's brief offered during the direct appeal which the defendant alleges was accepted by this Court as true and accurate and thus affected his right to appeal his conviction. The district court found that this claim, while it had factual merit, did not affect the defendant's direct appeal and denied the defendant's section 2255 motion.

To understand the significance of the false information presented to this Court by the government during the direct appeal it is necessary first to understand the business in which the defendant was engaged and for which he was convicted of mail fraud. The defendant designed, manufactured, and sold, through the United States mails, supercharger and turbine engine assembly kits while doing business under the name of Turbonique, Inc. These kits were composed of rough metal castings which required elaborate machining and finishing before they could be assembled —and once assembled needed extensive additional equipment before they could be installed on an automobile. The total cost of assembling and installing a supercharger appears to have been three or four times the initial cost of a casting kit.

The defendant was charged with fraudulently representing these kits to be complete, or in other cases to have fraudulently represented them to be easily installed when in fact only a mechanic of superior skill and experience, working in a sophisticated machine shop, would be able to assemble them. Further the defendant was charged with fraudulently representing to potential customers that they could obtain exclusive distributorship rights in their area and that these distributorships would be enormously profitable due to the sizeable interest expressed in the kits by residents in that area. Finally the defendant was charged with fraudulently rep-

resenting to potential customers that he would refund their payment in the event they were dissatisfied with the kit.

Fifteen witnesses testified that they had purchased kits expecting them to be either complete, easily installed, or both, and that upon expressing dissatisfaction to the defendant found they were unable to obtain refunds of their payments but at best could obtain a credit against future purchases in the amount of their payment. These witnesses also testified to various additional representations which the defendant made personally, either in conversation in person or over the telephone, all of which proved to be false.

The issue before us concerns one of the catalogues the defendant used in his business. This catalogue was one of several promotional publications the defendant mailed to prospective customers, the others including typed letters, printed brochures and copies of advertisements which had appeared in national magazines such as *Hot Rod* and *Motor Trend*.

Purporting to quote from this catalogue, the government in its appellate brief included the statement:

> "The degree of difficulty to be encountered in the assemblage and installation of supercharger and turbine kits was described by Turbonique catalogues in the following language: 'Can be easily installed with the use of small, basic machine and hand tools.' (G. Ex. 24, 32). Testimony at trial revealed that a sixteen inch lathe, drill press and precision balancing equipment were tools absolutely necessary for assembling Turbonique supercharger kits described as Model No. C–2–C supercharger kits. (A. 158–159, 195–196, 759–760)." (Brief of Appellee, Page 5)

The actual language in the catalogue was quite different:

> " . . . most of the *machining* operations can be performed with small, basic machine and hand tools." (Emphasis added).

Inasmuch as one of the central issues in the case concerned whether the kits were represented as being ready to install, as opposed to being composed of castings which required further machining work, the difference between the two quotations seems substantial. In affirming the conviction of the defendant this Court, stated:

> "Turbonique catalogues said: 'Can be easily installed with the use of small, basic machine and hand tools.' Testimony at the trial revealed that a sixteen inch lathe, drill press, and precision balancing equipment were necessary tools for assembling the Turbonique Model No. C–2–C Supercharger." 431 F.2d 299, 302.

The striking similarity between the government's incorrect quotation and the Court's seems clearly to suggest that the Court accepted the government's version of the quotation as true.

A second inaccurate reference to the record was made on page 6 of the government's brief:

> "Information as to additional parts required for making the kit complete and operable, such as ignition systems, fuel tanks, plumbing fixtures, valves and bearings, was subtly concealed on one of the back pages of the catalogues (A. 162, 183–185; G. Ex. 24, 32)."

In fact, on page 8 of the catalogue in question the following statement appeared:

> "A complete factory assembled turbine ready for immediate installation on your vehicle or device. Before operating the purchaser must provide the necessary electrical hookup plus a fuel tank and associated details."

In addition on the same page of the catalogue the following details were given:

> "A complete set of unfinished castings are supplied, however, the builder must furnish all standard hardware items such as nuts, bolts, gaskets, bar stock, and other standards."

While not referred to in the Court's opinion, we can assume arguendo that

such misstatements were also viewed by the Court as accurate.

We hold that the trial court correctly dismissed defendant's section 2255 motion. Like the district court we believe the defendant's claim that the inaccuracies in the government brief on direct appeal affected the Court's view of the facts of the case is factually correct; yet this inaccurate account of the facts concerning one particular catalogue in no way affects the outcome of the legal issues involved in the case and the decision reached in that case was proper.

## I

■ Before considering the question of the effect the inaccuracies reflected in this Court's initial decision had on the defendant's constitutional rights of appeal and due process, we must first consider whether such a claim is proper on a section 2255 motion. We hold that such a claim can be raised in this case.

■ The Supreme Court has made it clear that the drafting of section 2255 was designed to create a more convenient procedure for processing federal habeas corpus appeals, but was not intended to limit the scope of habeas review by federal courts of the constitutional claims of federal prisoners. Kaufman v. United States, 394 U.S. 217, 221–222, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969). There the Court made clear that limitations on review due to conventional rules on finality of judgments were subject to the same restrictions as on state finality requirements. The standards of Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) and Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965) are thus applicable in determining whether the failure of the defendant to challenge the inaccuracies of the government's brief in his direct appeal should foreclose subsequent review under section 2255.

Certainly there would not appear to be the type of "deliberate by-pass" which the Supreme Court has described as being necessary to constitute a waiver of the right to raise a particular constitutional issue. In part this is true because the defendant could not know what value the Court of Appeals would place on the incorrect information until after its opinion was published.

■ Secondly where an issue of constitutional dimension has been raised which raises doubts concerning the fairness of the original proceeding, it has been held that "[c]onventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged." Sanders v. United States, 373 U.S. 1, 8, 83 S.Ct. 1068, 1073, 10 L.Ed.2d 148 (1963). See also Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

■ Thus while we recognize that our cases establish that section 2255 motions are not a "substitute for appeal", Brown v. United States, 480 F.2d 1036, 1038 (5th Cir. 1973); Larson v. United States, 275 F.2d 673 (5th Cir. 1960); Smith v. United States, 265 F.2d 14 (5th Cir. 1959), cert. denied, 360 U.S. 910, 79 S.Ct. 1297, 3 L.Ed.2d 1261 (1959), and certainly ordinary trial errors which can be found in the record are not appropriate matters for section 2255 review, nonetheless matters of such gravity as to go to the heart of the appeals process, which cannot be said to have been waived by the defendant, have not been thought to be foreclosed by the failure of defense counsel to raise the issue on direct appeal.

## II

■■ It seems clear that the government's brief in the direct appeal of this case contained serious misstatements which affected the court's view of the facts of the case. If it were true that these inaccuracies affected this Court's determination of the legal issues raised on that appeal, the defendant would have been denied due process in pursuing the appeal he was guaranteed as a matter of right. Coppedge v. United States, 369

U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1961). The issue we must decide is whether the incorrect quotations from one of the defendant's catalogues affected the outcome of the direct appeal. We hold that they did not.

Eight separate issues were raised on direct appeal. Seven of these regarded specific aspects of the trial court's handling of the trial and had nothing to do with the catalogue in question. In no way can the information contained in the catalogue affect the Court's decision concerning jury instructions, exclusion or inclusion of business records, allegedly prejudicial comments by the trial judge, or any of the other seven technical questions raised in the appeal. The last issue raised concerned the sufficiency of evidence to sustain the verdict. Only here could the government's misquotations affect the Court's decision.

The Court held "the record compels the Court to hold that the question of the defendant's guilt or innocence was properly submitted to the jury." 431 F.2d at 301. With this decision we agree. Given the state of the record we do not believe that there was a close question of guilt or innocence where one piece of evidence, distorted by the government, could affect the Court's view of the adequacy of the evidence to sustain the verdict.

Eleven persons were found by the jury to have been defrauded by the defendant. Of these eleven, nine testified that they did not receive the catalogue in question prior to placing their order. They testified they relied variously on advertisements, form letters, brochures or personal conversations with the defendant. The record shows that the defendant used brochures, form letters and advertisements placed in nationally circulated magazines which claimed the su-

perchargers were "easily installed". The fact that the defendant's catalogue might have contradicted these other sources of information is irrelevant.

The remaining two complaining witnesses received the catalogue but did not rely on it. One relied on a personal conversation with the defendant at his manufacturing plant in Orlando, the other relied on form letters he received. We believe that it was a jury question whether this reliance was reasonable and sufficient to amount to one of the elements of fraud.

The catalogue we are concerned with was both a government and a defense exhibit—and the relevant passages misquoted in the government brief were correctly read to the jury. There is no reason to believe that the jury lacked correct information. The record shows that the catalogue was generally sent only to customers who requested it and who prepaid one dollar. Nothing in the record leads us to believe that the catalogue which correctly stated the contents of the casting kits and the amount of additional equipment needed to use the kit was supplied to every customer, or that potential customers unreasonably relied on other misrepresentations when they had the alternative of ordering the catalogue, but failed to do so.

In short, we find the record amply sustains the jury verdict. However this Court might have been misinformed concerning one piece of evidence, that piece of evidence was largely irrelevant to the mass of evidence adduced at trial. Our view initially that the verdict was a jury question not to be disturbed was, we believe, a correct one, and one unaffected by errors in the government's brief.[1]

The judgment is affirmed.

---

1. This does not, of course, minimize the seriousness of the failure of the government counsel to be absolutely certain that critical quotations from a defendant's documents are word-perfect.