462 So.2d 1304 (1985)
STATE of Louisiana
v.
Victoria SANCHEZ.
No. 84-KA-135.
Court of Appeal of Louisiana, Fifth Circuit.
January 14, 1985.
Writ Denied March 22, 1985.
*1305 Ronald S. Ruiz, New Orleans, for defendant-appellant.
John M. Mamoulides, Dist. Atty., Dorothy A. Pendergast, Asst. Dist. Atty., 24th Judicial Dist., Jefferson Parish, Gretna, for plaintiff-appellee.
Before CHEHARDY, CURRAULT and DUFRESNE, JJ.
DUFRESNE, Judge.
The defendant, Victoria Sanchez, was convicted by a jury of manslaughter, (LSA R.S. 14:31). She was sentenced to imprisonment for ten years at hard labor. The sentence was suspended and the defendant was placed on active probation for five years and a special condition was made that she return to Honduras permanently. We affirm the conviction, but remand for resentencing.
She relies on one assignment of error; that the trial judge erred in not granting the defendant's motion to suppress inculpatory statements.
The basic facts are these:
On the evening of December 18, 1982, John Cassanova (neighbor of the defendant) upon returning home, observed Victoria Sanchez clad only in panties and a "flimsy" blouse, standing outside on the lawn between his house and hers. He also observed his wife standing nearby holding two bath towels.
He spoke first to his wife who informed him that there had been a disturbance at the Sanchez residence and that "Vicky had come over for help, and that Vincente had killed himself ..." She then handed her husband the bath towels for Ms. Sanchez. Cassanova then spoke to Ms. Sanchez who told him "Sanchez tried to kill me, and then killed himself ..." Having previously been a medic, Cassanova decided to enter the Sanchez residence to determine whether Vincente Sanchez was in need of assistance. As he reached the den area of the house he observed Vincente Sanchez lying on the floor "with all of the weapons around him, as though it was some type of ornamentation around him." Cassanova *1306 felt for a pulse and as he touched the carotid artery, Sanchez's head turned and blood came from his mouth. At that point Cassanova felt sure Sanchez was dead.
As he had been trying to ascertain the medical condition of Vincente Sanchez, Victoria Sanchez had been screaming incoherently and Cassanova felt that she was on the brink of hysterics. As he watched, she began to use the towel he had previously given her to wipe off the guns which were laying near her husband's body. Cassanova interrupted the activity and told her to put more clothes on while he called the police to report the homicide. While he was waiting for the officers to arrive, Ms. Sanchez returned to the den from the bedroom area, sat on the sofa, and looking at her husband stated, "Oh, why did you make me do this?"
Shortly thereafter, Officer Theresa Gauci arrived at the residence. She attempted to speak with Ms. Sanchez but received no response. Because of the injury to Ms. Sanchez's arm, an ambulance was called and Ms. Sanchez, accompanied by two deputies, was transported to East Jefferson Hospital for treatment.
At the hospital, Ms. Sanchez received five (5) stitches on her left arm, and to calm her, an injection of vistaril. The hospital bill contained in the record also reflects that a tetanus shot was administered. She was discharged at 1:50 a.m. on the morning of December 19, 1982.
Detective Marco Nuzzolillo employed in the Homicide Unit of the Jefferson Parish, was called regarding the death of Vincente Sanchez at about 11:30 p.m. He arrived at the Sanchez residence at about 12:05 on the morning of December 19th, and began conducting the investigation. After directing the Crime Scene Technicians to process the scene, Nuzzolillo interviewed several witnesses, including the Cassanovas. He then proceeded to the East Bank Lockup to interview Ms. Sanchez who was being transported from the hospital to that location. Because he had been informed that Ms. Sanchez spoke only Spanish, he requested an interpreter from the Jefferson Parish Sheriff's Office, but was told that no one was available. State Trooper John Escoto was contacted by a close friend of the defendant. Escoto contacted the First District Lockup and, after learning that an interview was to be conducted, volunteered his services as an interpreter. He was accepted as such and proceeded to the lockup on Metairie Road where he met with Nuzzolillo and Victoria Sanchez.
Following an explanation by Trooper Escoto, a waiver of rights form was executed by Victoria Sanchez at 2:25 a.m. on the morning of December 19, 1982. Trooper Escoto testified that the initial interrogation lasted approximately twenty minutes, although Detective Nuzzolillo who conducted the questioning, stated it lasted closer to an hour.
Following the interview, they returned to the Sanchez house, at Nuzzolillo's request, arriving at approximately 3:58 a.m. Ms. Sanchez re-enacted the struggle of the previous evening, with Trooper Escoto acting as Vincente Sanchez.
On December 21, 1982, at 3:12 p.m. following further investigation by Detective Nuzzolillo, conflicting information was developed and another statement was taken from Ms. Sanchez. This statement, taken through a different interpreter, was substantially similar to the one previously given, except that Ms. Sanchez admitted that during the struggle she may have shot her husband.
Following the second statement, Ms. Sanchez was arrested for murder and the present prosecution ensued.
Although the defendant did not file assignments of error with the trial court, she has incorporated the one assignment of error in her appellant brief.
In the past, this court has ruled that assignments of error which were not formally filed with the trial court and therefore not included in the record, but rather were incorporated into the brief, have not been properly presented for review. See State v. Blanchard, 450 So.2d 738 (La.App. 5th Cir. 1984); State v. Jack, 448 So.2d 725 *1307 (La.App. 5th Cir.1984); State v. Sonnier, 441 So.2d 359 (La.App. 5th Cir.1983).
However, in the interest of judicial economy, rather than dismiss the defendant's appeal, we will nevertheless consider the argument presented by the defendant.
Defense counsel maintains that the statement given by Victoria Sanchez on December 19, 1982, was not freely and voluntarily made as she had been given 100 mg. of vistaril intravenously, a couple of hours earlier.
Before a confession can be introduced in evidence, it is incumbent upon the state to prove that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La.R.S. 15:451; State v. Robinson, 384 So.2d 332 (La.1980). The state must also establish that an accused who makes a confession during custodial interrogation was first advised of his Miranda rights. State v. Kersey, 406 So.2d 555 (La.1981).
Officer Marco Nuzzolillo, the chief investigator of the homicide from the Jefferson Parish Sheriff's Office testified that he met and spoke to Victoria Sanchez concerning the death of her husband on two occasions, on December 19, 1982, at 2:25 a.m. and on December 21, 1982, at 3:12 p.m., each time advising her of her constitutional Miranda rights through an interpreter. Trooper John Escoto and Ms. Lenora Trombach acted as interpreters on December 19, 1982, and December 21, 1982, respectively. The Rights of Arrestee and Suspects form was signed by Mrs. Sanchez as well as by Officer Nuzzolillo and Trooper Escoto. Officer Nuzzolillo said Mrs. Sanchez signed a waiver of her rights and did not ask to speak with a lawyer.
Officer Nuzzolillo said Mrs. Sanchez spoke to him about the incident involving her husband's death on December 19, 1982, through interpreter, John Escoto, and at no time was she promised anything, threatened or coerced in connection with making any statements. Officer Nuzzolillo said he was satisfied that Mrs. Sanchez was speaking to him freely and willingly.
Mrs. Sanchez gave oral statements on both December 19, 1982, and December 21, 1982. Officer Nuzzolillo related the substance of the statement given to him by the defendant on December 19, 1982, as follows:
She told me that her husband wanted to kill her because she objected to his having an affair with her niece in Honduras. She told me that while at their residence, they struggled over what possibly might have been a rifle. She wasn't sure at that time. She told me that she struggled over a small, yellow box, which she later believed to be ammunition. She told me he attacked her with a machete, and she defended herself by using her hands to grab the machete.
She told me that she ran out of the house, and she was leaving the house, she heard another shot. And prior to that, she told me that they had begun struggling, this time with a rifle for sure. If you remember a little while ago, I said she struggled with what she thought might have been a rifle. But she wasn't sure, then the machete. Now she is saying she struggled with a rifle with her husband. She said that his hand was near the trigger. Her hand was on his hand. They were struggling, and she heard several shots. Then when she ran out, she heard more shots.
With regard to the second statement he took on December 21, 1982, Officer Nuzzolillo said that Mrs. Sanchez gave him the same information about what had occurred, the only difference being that towards the end of the interview she said, "While I was fighting with him, I may have shot him."
Officer Nuzzolillo testified that at the time Mrs. Sanchez gave her statements to him on both occasions, she seemed to him to be aware of her surroundings and in control of her talking.
When asked, "Was there at any time that you were under the impression that Mrs. Sanchez did not, either know where she was, what she was saying, or what she was doing?" Officer Nuzzolillo answered, "No".
*1308 Trooper John Escoto testified that he read Mrs. Sanchez her rights on December 19, 1982, from a Jefferson Parish Sheriff's Office Rights Warning Certificate when he acted as an interpreter for Officer Nuzzolillo and translated each individual sentence in the rights warning procedure. Trooper Escoto said Mrs. Sanchez indicated to him that she understood her rights and signed the form in his presence. She indicated to him that she wished to waive her rights and give a statement.
Trooper Escoto said he thought Mrs. Sanchez was aware of what she was doing at the time she gave her statement. He said there were periods when she was sobbing but that she was coherent for the most part.
At the pre-trial hearing on the motion to suppress inculpatory statements, Trooper Escoto said he had been made aware of the incident involving Vincente Sanchez's death by Officer Nuzzolillo before he began to act as an interpreter. Trooper Escoto said Mrs. Sanchez was somewhat nervous at the interview and at times rambled saying things that didn't make sense to him. This did not surprise or concern Trooper Escoto.
In response to questioning by the assistant district attorney, Trooper Escoto testified that it never appeared to him during the course of the interview that Mrs. Sanchez was not aware of what she was doing and that her reactions to questioning were no different than those he had observed in other witnesses.
After Victoria Sanchez gave her statement on December 19, 1982, Officer Nuzzolillo obtained a consent to search the residence from her and he went there with the defendant, Trooper Escoto, the defendant's sister, and the sister's husband.
Officer Nuzzolillo explained that he wanted to go to the Sanchez residence to look over the scene with Victoria Sanchez and let her again re-enact what had happened. Officer Nuzzolillo said at that time, Mrs. Sanchez showed him the general area of the altercation and demonstrated defensive moves she made to block a machete blow.
The effect of 100 mg. of vistaril administered intramuscularly to Victoria Sanchez on December 19, 1982, at 12:19 a.m. at East Jefferson Hospital was first addressed by psychiatrist, Dr. Robert Ancira, defense counsel's medical witness at the hearing of motion to suppress.
Dr. Ancira testified he examined Victoria Sanchez in April and May of 1983 in order to evaluate her state of mind at the time of the crime, to determine the effect of the vistaril and to help her manage the anxiety and depression he found she was experiencing.
In response to defense counsel's questioning on the effects of an injection of 100 mg. of vistaril on Mrs. Sanchez a couple of hours before she was questioned, Dr. Ancira described vistaril as a mild tranquilizer for reduction of anxiety and tension and said it is most commonly used for patients before going into surgery. The doctor said the usual dosage is anywhere from 50-100 mgs. intramuscular for a faster onset of action up to every 4-6 hours.
In Mrs. Sanchez's case, Dr. Ancira said from what he understood, she was in an agitated state, tense and upset and the injection of the vistaril would have calmed her down and made her more cooperative.
An examination of the substance of Victoria Sanchez's statement given on December 19, 1982, reveals that it is exculpatory, depicting a series of struggles between she and her husband and in the final struggle over a gun, some shots were fired and Vincente Sanchez died.
The United States Supreme Court in the case of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963) set forth the criteria for evaluating the admissibility of a confession.
If an individual's "will was overborne" [footnote omitted] or if his confession was not "the product of a rational intellect and a free will", [footnote omitted] his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological *1309 pressure and, of course, are equally applicable to a drug-induced statement.
In the Physician's Desk Reference Book, vistaril is described as a drug that induces a calming effect in anxious, tense, psychoneurotic adults and also in anxious, hyperkinetic children without impairing mental alertness. It is not a cortical depressant.
The trial judge asked Dr. Ancira during the pretrial hearing on the Motion to Suppress Inculpatory Statements whether Victoria Sanchez would have been coherent when questioned by officers an hour and a half after receiving the medication and the doctor said that she would be.
A review of the record in this case reveals that two inculpatory statements not challenged by the defense made by Victoria Sanchez were made when she was not under the influence of any medication.
The first inculpatory statement was made shortly after the incident in the presence of next-door neighbor, John Cassanova. Mr. Cassanova said that Victoria Sanchez sat on the sofa in her house and looked at her dead husband and exclaimed, "Oh, why did you make me do this."
On December 21, 1982, at approximately 3:12 p.m. at the time she gave a second statement to Officer Nuzzolillo in the presence of interpreter Lenora Trombach, Officer Nuzzolillo said Victoria Sanchez related the same story about the incident as she did on December 18, 1982; the only difference being that after describing a final struggle with a rifle, she said, "I may have shot him."
The fact that Mrs. Sanchez corroborated in substance her first statement a second time on December 21, 1982, with the only difference being an inculpatory suggestion that she may have shot her husband and was able to return to the scene an hour after that initial statement and re-enact the events as she had related them earlier at the police district, gives additional support that the statement she made on December 19, 1982, was freely and voluntarily made.
The trial judge did not err in concluding that the defendant knowingly and intelligently waived her constitutional rights and freely and voluntarily made the statement.
Accordingly, the assignment of error has no merit.

ERROR PATENT
We have reviewed the record for error patent under La.C.Cr.P. art. 920(2) and it appears that the special condition of probation is violative of due process or equal protection.
At the conclusion of trial, the jury found Victoria Sanchez guilty of manslaughter. The trial judge sentenced Victoria Sanchez to ten (10) years imprisonment at hard labor. The judge suspended the sentence and placed the defendant on active probation and imposed, as a special condition of probation, that Victoria Sanchez leave the United States and return to Honduras, permanently.
In Rutherford v. Blankenship, 468 F.Supp. 1357, (U.S.District Ct., U.S.Va. 1979), the petitioner pled guilty to malicious wounding and driving an automobile after having been adjudicated a habitual offender. Rutherford received ten (10) years imprisonment on the malicious wounding conviction to be suspended and one (1) year unsuspended on the habitual offender conviction to run concurrently with a third charge. As part of the plea agreement (in order to obtain suspension of the ten (10) year sentence) Rutherford agreed to leave the State of Virginia on the expiration of the one year term. The court found the banishment condition null, void and unenforceable. The Rutherford court stated that "the power to banish, if it exists at all, is a power vested in the Legislature and certainly where such methods of punishment are not authorized by statute, it is impliedly prohibited by public policy, People v. Baum, 251 Mich. 187, 231 N.W. 95 (1930), 70 A.L.R. 98 (1931)." Rutherford v. Blankenship, supra at 1360.
The Rutherford Court found that one state could not banish a criminal to another as that was prohibited by public policy and not in the interests of safety and welfare.
*1310 In the case of Dear Wing Jung v. United States, 312 F.2d 73 (U.S. 9th Cir.1962), a Chinese national was sentenced to six months imprisonment suspended on the condition that he leave the United States. The court rejected the government's argument that they had given the defendant a choice and found that the banishment condition of the sentence was either violative of due process or equal protection and was unconstitutional and remanded the case to the District Court for sentencing in accordance with the law.
It is apparent that the portion of trial judge's sentence in the instant case which imposes banishment as a special condition of probation is unconstitutional.
The defendant's conviction is affirmed. However, the sentence imposed is vacated and set aside and the case is remanded to the district court for resentencing.
CONVICTION AFFIRMED, SENTENCE VACATED, CASE REMANDED TO DISTRICT COURT FOR RESENTENCING.