GAUDIN, Judge.
Sixteen-year-old Errol J. Carlin, Jr. was found guilty of second degree murder by a jury in the 24th Judicial District Court. He had been charged with the June 2, 1986 fatal stabbing of Tobias Boteler after an argument over a radio.
On appeal, Carlin assigns four district court errors. He contends that the trial judge erred in:
(1) admitting his (Carlin’s) recorded statement into evidence,
(2) refusing to read a negligent homicide charge requested by the defense,
*1367 (3) failing to change the verdict to manslaughter, and
(4) recharging the jury in his (Carlin’s) absence.
Finding no reversible error in any of these assignments, we affirm Carlin’s conviction and his sentence to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Also, we searched for errors patent and found none.
BACKGROUND
According to witnesses who testified at the trial, Carlin and Boteler, aged 21 years, argued on the day Boteler died. Boteler accused Carlin of breaking into his apartment.
Seymour Hampton overheard the argument. He said that Boteler told Carlin not to come back to his apartment, but Carlin said he would. When Boteler started walking toward the rear of the apartment complex, Carlin followed several minutes later.
Joseph Weisks was another witness. He stated that when he drove into the apartment complex’s parking lot, not long after Carlin had followed Boteler to the back of the complex, Boteler ran toward him saying “Help me, mister, I’ve been stabbed.”
Michelle Pate also testified at the trial. She said that she was driving by in an automobile when Weisks flagged her down and asked her to contact a hospital. She told the jury that Boteler was on the ground when Carlin approached. She said:
“He (Carlin) had the radio in his hands and he was shaking it, trying to get it to work, playing with the knobs and stuff. He pointed to this guy that was laying on the ground and said, ‘That mother fucker broke my radio.’ Then he took the radio and threw it in the dumpster, and called it a piece of shit.”
Carlin was later apprehended and taken to the First District police station on Me-tairie Road where, in due course, he gave a statement which was recorded.
ASSIGNMENT NO. 1
This assignment of error deals -with the recorded statements. On the second day of the trial, the defendant moved to suppress the statements. The motion, heard outside the jury’s presence, was denied.
Carlin submits that the statements made were given under duress and before he consulted an informed adult interested in his welfare. Carlin was in consultation with his mother, Mrs. Mary B. Carlin, at the police station but allegedly she was intoxicated.
Detective Bernard Wortmann testified at both the motion to suppress and during the actual trial. He said that Carlin’s rights, both as an adult and as a juvenile, were read and fully explained to him and his mother and that both Carlin and Mrs. Carlin signed all necessary forms.
The “Juvenile Rights Form” is signed by Mrs. Carlin, a 39-year-old high school graduate, and by Carlin, who, according to the form, completed the 9th grade.
Wortmann further testified that no force or pressure was used and that the statement Carlin made was free and voluntary.
Mrs. Carlin testified that she was “terribly emotional and confused” at the police station and that she had consumed “six to eight” beers and “one or two” Valium pills that day. However, under cross examination, Mrs. Carlin said she didn’t think she told Wortmann that she had taken one or two Valiums or that she had any problem understanding his questions. Further, Mrs. Carlin stated that Wortmann neither threatened nor struck her son.
Asked if she advised Wortmann that she had been drinking, Mrs. Carlin answered: “He was probably aware of that.” Wort-mann, however, said Mrs. Carlin was not intoxicated or under the influence of liquor or drugs.
Also, Mrs. Carlin testified that on at least two occasions she left the interrogation room with her son and spoke with him alone. Mrs. Carlin was asked whether her *1368 son ever indicated that he did not want to make a statement. Her response: “I don’t think so.”
Wortmann said that Mrs. Carlin "appeared to be very competent” and that she read and indicated that she understood the forms.
On the “Juvenile’s Waiver of Rights” form, signed by Carlin, this question is asked: “Have any threats or promises been made to you or has any pressure of any kind been used to get you to answer questions or to give up any of your rights?” Carlin checked “Yes,” but he refused, Wortmann said, to provide any information regarding threats or promises. Wortmann testified that Carlin checked “Yes” in this instance merely because "... he was being belligerent.”
Other than this “Yes” on the form, the record is completely devoid of any suggestion that threats or promises were made or any pressure put on either Carlin or his mother.
In deciding that Carlin’s recorded statement was admissible, the trial judge said:
“I’m going to allow the statement. I’ll tell you why. I read your cases, by the way, Counsel. They’re before me as I sit here. I think the officer should be commended. He wrote down exactly what the man said. It’s a troublesome question, whether any force or coercion had been applied, and apparently the Defendant responded yes. The officer then redirected, he says, the question to the man in just the way you suggested he should, asking for the details, who did it. The man says: I don’t know. There isn’t even, at the beginning — well, let me skip that for a minute. The mother was present in the room. You suggested there should be another witness. There couldn’t be a better witness than the boy’s own mother. She’s present in the room. She detects nothing untoward going on. At least on two occasions, as I understand it, she was permitted to talk to her son without the presence of the officer. At no time did they indicate that they did not want the statement to go on. This Defendant was aware of the fact that he could stop the statement at any time, and chose not to do so. I think if you look at all of the particulars surrounding the statement, as you must, then you must arrive at the conclusion that it was voluntary. Therefore, I’m going to let the statement in.”
Before a confession can be placed in evidence, the prosecution must prove that it was freely and voluntarily given, that there had been no threats, promises, coercion, inducements or promises, that the accused was fully advised of his or her constitutional rights and that he or she knowingly and intelligently waived these rights. In the case of a juvenile, the record must further show that he or she had prior meaningful consultation with an attorney or competent adult interested in his or her welfare. If an adult other than an attorney was consulted, he or she must have been completely advised of the juvenile’s rights. See LSA-R.S. 15:451, State v. Sanchez, 462 So.2d 1304 (La.App. 5th Cir.1985) and many other cases with similar holdings.
Here, the record indicates that the trial judge properly allowed the confession to be submitted to the jury. See State v. Shepherd, 449 So.2d 1120 (La.App. 5th Cir.1984), which states, at page 1123, that the voluntariness of any confession must be resolved from the facts and circumstances of each case. The trial judge must consider the totality of circumstances in deciding whether a confession is admissible. Here, the state did not rely on general disclaimers; the prosecution showed that no pressure or unfair influence was placed on either Carlin or his mother; and that Carlin before confessing did consult several times with his mother, an informed adult concerned with his welfare. Carlin’s mother was aware of her son’s constitutional rights.
We have carefully listened to the tape recorded evidence. Carlin appeared to be in full control of his faculties and emotions as he gave his version of how Boteler was killed.
*1369 This confession was properly admitted into evidence by the trial judge after evaluating all of the circumstances.
ASSIGNMENT NO. 2
Citing State v. Marse, 365 So.2d 1319 (La.1978), appellant argues in this assignment of error that the trial judge erroneously refused to read to the jury a charge on criminal negligence and negligent homicide. In Marse, the Supreme Court of Louisiana stated that a negligent homicide charge (or any requested charge, for that matter) should be given if it does not require qualification limitation or explanation and is not included in the general charge, if wholly correct and pertinent. See also LSA-C.Cr.P. art. 802.
Carlin requested that the following charge be read:
“Criminal negligence under Louisiana law exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
“While negligent homicide is classified under Louisiana law as a grade of criminal homicide, it is not a responsive verdict to this indictment under Article 814 of the Louisiana Code of Criminal Procedure. Therefore, I charge you that if you the jury conclude that the defendant’s conduct amounts to no more than criminal negligence as previously defined, you must acquit the defendant.”
In denying Carlin’s request to read this charge, the trial judge said that “this is not a proper case for a Marse charge. There’s not one scintilla of evidence in this case that would tend toward the giving of that charge.”
Carlin said that when he and the victim were engaged in a physical struggle, Boteler hit him with a pipe. The police officers who saw Carlin shortly after the alleged scuffle testified that there were no cuts or bruises or anything else to indicate that a fight had taken place.
Wortmann said that in response to Carlin’s claim that he had a “hickey,” he (Wortmann) felt Carlin’s head but did not find any lump or broken skin. A search was made for the pipe but it wasn’t found. Also to be considered is Carlin’s complete lack of concern for Boteler following the stabbing.
Cases subsequent to Marse have held that a requested charge need not be read if there was no evidence to support it. See State v. Anderson, 390 So.2d 878 (La.1980).
Carlin was convicted as charged, the jury finding that he had the specific intent to kill Boteler. If the trial judge erred in not reading the criminal negligence — negligent homicide charge, the mistake, considering the testimony and evidence, was harmless.
We do not believe, however that the trial judge was in error. There was no evidence supportive of the requested charge.
ASSIGNMENT NO. 3
After the guilty verdict was returned, Carlin unsuccessfully moved for a reduction from second degree murder to manslaughter. LSA-R.S. 14:31(1) defines manslaughter as:
“A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed....”
The only evidence that Carlin was provoked was his own unsubstantiated testimony via the recorded statement. The tes *1370 timony otherwise showed that Boteler left the initial scene and went to his apartment after telling Carlin not to follow. Carlin, however, removed his shirt and did go after Boteler. If Carlin felt threatened or provoked, he had time to regain his composure.
The evidence further showed no signs or indications that a fight had occurred between Carlin and Boteler before the victim was stabbed.
We are mindful of State v. Lombard, 486 So.2d 106 (La.1986), but the instant facts and circumstances differ.
ASSIGNMENT NO. 4
While the jury was deliberating, they asked for a further instruction on the difference between second degree murder and manslaughter. The jurors returned to the courtroom and additional instructions were given. It was at that time brought to the trial judge’s attention that Carlin had not been present. Carlin’s trial attorney then waived the defendant’s presence.
In State v. Williams, 258 So.2d 534 (La. 1972), a conviction was reversed because the defendant was not present when the jury received additional charges. This defendant was convicted of a capital offense. His presence could not be waived.
LSA-C.Cr.P. art. 832 reads:
“A defendant charged with a felony not punishable by death cannot object to his temporary voluntary absence ... if his counsel was present ...”
The record does not indicate whether Carlin’s absence was voluntary or not. His absence was certainly temporary. Carlin’s attorney was present and he did not object to his client’s absence either before or during the additional charge. Following the reading, the attorney waived Carlin’s presence.
Under these circumstances, in a non-capital proceeding and in the absence of any suggestion of possible prejudice, we find this assignment of error without merit. It is inconceivable that Carlin’s presence while the additional charge was given would have changed the jury’s verdict.
Carlin’s conviction and sentence are affirmed.
AFFIRMED.