34 F.3d 1071
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Robert BARKER, Jr. Petitioner-Appellant,
v.
John RATELLE, Warden, Respondent-Appellee.
 No. 93-56002.
 United States Court of Appeals, Ninth Circuit.
 Submitted May 6, 1994.*
Decided Aug. 25, 1994.
 
 1
 Before: BROWNING and FLETCHER, Circuit Judges, and FITZGERALD,** District Judge.
 
 
 2
 MEMORANDUM***
 
 
 3
 Robert Barker appeals pro se the district court's denial of his pro se petition for a writ of habeas corpus. Barker argues that his California first-degree murder conviction was secured in violation of his constitutional rights to a speedy trial, to due process, and to effective assistance of trial and appellate counsel.
 
 
 4
 We have jurisdiction to hear Barker's timely appeal pursuant to 28 U.S.C. Sec. 1291, and we affirm.
 
 FACTS AND PROCEDURAL HISTORY
 
 5
 At about 2:00 a.m. on April 6, 1985, Barker's friend Larry Carranza was driving home when he fell asleep at the wheel and veered into Walter Schumacher's parked and unoccupied truck. He sustained a cut to his forehead, which resulted in some bleeding. Werner Schumacher, Walter's brother, came out of their house and saw what had happened. He went back inside, woke his brother, and called the police. The police told him that if nobody had been injured, the parties should simply exchange papers.
 
 
 6
 Werner testified that he then went back outside, and saw his brother standing in the street by Carranza's car, in which Carranza was seated. Werner claims they were talking, and that Carranza was saying he would take care of everything. Seeing that Carranza had a cut on his forehead, Werner walked back toward the house to call the police again. Just before he entered the house, he observed a car pulling up. His physical description of the car and of its "diesel" engine sound matches that of Barker's car.
 
 
 7
 Werner continued inside to the phone, and heard nothing more except a voice saying something like "let's get out of here before the cops come." He testified that this voice did not sound like Carranza's. Shortly thereafter, his brother came through the front door bleeding, told Werner to get away from the men outside, and collapsed. He had four stab wounds, two of them fatal.
 
 
 8
 Carranza testified that he had been drunk during this incident and had a poor recollection of the precise events. His story is inconsistent with Werner's. He claims that he was outside of his car when Barker drove up, and that Barker took him aside and suggested they flee the scene and report his car stolen in order to avoid charges for intoxicated driving. He agreed with this plan, and got into Barker's car. He saw Walter following Barker around the car, saying "you can't do that," and that Barker replied "go on, get out of here." He neither saw nor heard anything thereafter, except he remembers that Barker got into the car at some point and he and Barker drove away. Barker dropped him off at his house and told him not to tell anybody that Barker had been with him.
 
 
 9
 Barker's girlfriend, Charlene Wine, also testified at trial. She claimed that on April 16 (ten days after the homicide), Barker came to her house and confessed to killing someone. Barker did not tell her exactly what happened, but she overheard Barker tell her roommate (who didn't testify at trial) that he had tried to break up a fight between the victim and Carranza, and had stabbed the victim when he could not. Barker then came into her room and attacked her, saying he would have to kill her and her roommate because they knew about the killing. Wine fought him off by smashing him on the head with a radio, and he ran away.
 
 
 10
 Barker remained a fugitive until June 20, 1985, when he was arrested in Yakima, Washington. An information was filed against him on July 29, 1985. On August 27, 1985, a hearing was held in response to Barker's request that his appointed attorney, public defender Ary De Groot, be replaced with a different attorney. The court denied Barker's motion to substitute counsel, finding that Barker had misinterpreted certain of De Groot's statements to him, and that De Groot had not done anything to indicate he was not performing capably. Barker renewed his motion at a hearing on January 8, 1986, claiming that De Groot had failed to locate certain key witnesses whose names Barker had provided, and that De Groot was not returning his phone calls. De Groot said he was on the job, but that the Public Defender's office had only two investigators available to do work like locating witnesses, and that they had been busy on other cases. De Groot asked for an eight-week continuance. The court asked Barker if he would give up his right to a speedy trial so that the continuance could be granted. Barker said no. The court advised Barker that it thought "you are committing suicide by not cooperating with your attorney." The court continued trial 15 days, and denied the motion to substitute counsel. Ultimately, trial was delayed more than two months, until April 3, 1986.[1]
 
 
 11
 De Groot called Barker as the only witness to counter the testimony of Carranza, Werner Schumacher, and Wine. Barker testified that as he drove up Walter Schumacher was choking Carranza in anger. He saw blood on Carranza's forehead, and presumed it came from Schumacher's attack. Schumacher had lifted Carranza completely off the ground, and appeared to be strangling him. He tried to get Carranza loose from Schumacher's grip, failed, and then pulled a small knife out of his pocket. He told Schumacher to let go of Carranza or he would "poke" him. When Schumacher ignored him, Barker stabbed him. The first stab had no effect, so Barker stabbed again, still without effect. He then stabbed twice more, "in a row." At this point Schumacher let go of Carranza and went back into the house. He then got Carranza into his car and drove him home.
 
 
 12
 Barker's defense was thus to admit to the stabbing, but to contend that he did it out of fear for his friend's life. His defense was supported to some extent by Wine's testimony. It was directly contradicted by Carranza's testimony. Carranza's testimony, however, was suspect in at least one key respect: a drop of Walter Schumacher's blood was found on Carranza's shoe. If, as he claimed, he had been inside Barker's car when the stabbing occurred, how the blood got there is unexplained.
 
 
 13
 The jury found Barker guilty of first-degree murder. He was sentenced to 25 years in prison, plus a consecutive one-year term for the use of a dangerous weapon in connection with the crime. His appointed counsel's direct appeal to the California Court of Appeal advanced only one ground for reversal: that the trial court erred in not sua sponte giving an "accomplice" instruction about Carranza's credibility (since according to Carranza's story, they had formed a joint plan to flee the scene of his drunk driving offense). Barker, however, supplemented counsel's brief with his own, which advanced three additional grounds: prosecutorial misconduct, cruel and unusual punishment, and insufficiency of the evidence. The Court of Appeal rejected all four arguments.
 
 
 14
 Barker's habeas petition was rejected by the California Supreme Court on March 25, 1992. He subsequently filed a petition for habeas relief in federal district court. The district court adopted the magistrate judge's recommendation to dismiss the petition.
 
 DISCUSSION
 
 15
 The denial of a petition for habeas corpus relief is reviewed de novo. Adams v. Peterson, 968 F.2d 835, 843 (9th Cir.1992), cert. denied, 113 S.Ct. 1818 (1993). Barker's appeal raises five issues, which we consider seriatim.
 
 I. Speedy Trial
 
 16
 Barker contends that his counsel's delay in preparing for trial caused him a loss of his speedy trial rights. Criminal defendants have a Sixth Amendment right to a "speedy and public trial." U.S. Const. amend. VI; Barker v. Wingo, 407 U.S. 514, 515 (1972). In evaluating a speedy trial claim, the court must
 
 
 17
 weigh four factors: the length of the delay between accusation and trial, the reason for the delay, the timeliness and manner of [defendant's] assertion of his right to a speedy trial, and the prejudice to him caused by the delay.
 
 
 18
 United States v. Valentine, 783 F.2d 1413, 1417 (9th Cir.1986).
 
 
 19
 Here, eight months passed between the filing of the information against Barker and his trial, a delay sufficient to "trigger" inquiry into the other factors. Id. (length of delay is treated as a triggering factor; six-month delay sufficient to trigger inquiry into other factors). The delay was caused neither by the People nor the court, but by Barker's appointed counsel. Counsel claimed that he and his investigators were overworked and could not prepare for trial in time. The trial court accepted this as a true statement made in good faith; Barker makes no compelling argument why this finding should be disturbed on habeas review. Barker appears to concede that he formally "waived" his speedy trial rights, but argues that his attorney fraudulently tricked him into doing so. However, the only fraud he alleges is that the attorney told him the delay was necessary in order to prepare effectively for trial, but that the attorney never did prepare effectively. Finally, as to prejudice: Barker's only specific claim is that because of the delay his key witnesses had relocated and were no longer available for trial. This claim is not only unsubstantiated; it is belied by his assertion that he sought to substitute counsel precisely so that the new attorney could bring these witnesses in for trial, and his claim that his appellate counsel could have and should have located these witnesses and presented their affidavits.
 
 
 20
 In sum, any delay in Barker's case is wholly attributable to his appointed attorney, De Groot, and whatever prejudice he alleges is based on De Groot's failure to secure the alleged witnesses. Therefore, Barker's concerns are better addressed in the context of his claim that De Groot's assistance was ineffective.
 
 II. Denial of Motions to Substitute Counsel
 
 21
 Barker claims that "Denial of Appellant['s] Marsden[2] hearing was a Violation of Due Process." Informal Brief at 3. However, the trial court did in fact hold two Marsden hearings, in response to Barker's motions to substitute counsel. Rather than appealing a denial of hearing, Barker is apparently appealing, on the merits, the denial of his request to substitute counsel. While the denial of a hearing, or the refusal to even entertain a motion to substitute, might constitute a due process violation, the denial of such a motion on its merits, after holding a full hearing, would not unless the showing were compelling. See United States v. Torres-Rodriguez, 930 F.2d 1375, 1380 (9th Cir.1991) (ruling on motion to substitute counsel rests within sound discretion of trial court).
 
 
 22
 Moreover, at the two Marsden hearings Barker raised only one substantial ground for substitution: that his attorney had failed to search for important witnesses, whose names Barker had given to him.[3] The court inquired of counsel, and satisfied itself that the public defender's investigators had been busy on other cases, and would soon be turning to the task of finding Barker's witnesses. Thus, again, Barker's claim concerning De Groot's failure to investigate is better treated as part of his ineffective assistance charge. The trial court's conduct of the Marsden hearings, and its denial of Barker's request to substitute counsel, did not constitute violations of due process.
 
 III. Ineffective Assistance of Trial Counsel
 
 23
 Barker claims he received ineffective assistance from his trial attorney, public defender Ary De Groot. A defendant claiming ineffective assistance must demonstrate both that counsel's actions were "outside the wide range of professionally competent assistance," and that counsel's incompetent actions resulted in prejudice to defendant. Strickland v. Washington, 466 U.S. 668, 687-90 (1984); United States v. Swanson, 943 F.2d 1070, 1072 (9th Cir.1991).
 
 
 24
 Contrary to the district court's assertion, Barker does specifically indicate the way in which he thinks De Groot was ineffective. He claims that De Groot failed to locate and present at trial certain witnesses:
 
 
 25
 appellant discovered subsequently through mutual acquaintances of his and "Larry's" [Carranza's], that Larry was saying to them and others what actually occurred. Appellant asked a couple guys in the jail who were housed in the same section as Larry, what he was saying about the incident. Appellant discovered Larry was in fact informing them generally what had occurred.
 
 
 26
 Reply Brief at 2. It appears that Barker told his attorney that Carranza was singing a different tune to his jailmates than the one he planned to sing to the jury. De Groot admitted at the second Marsden hearing that he was going to investigate at least one "witness who may be very vital." AER at 84. However, this witness is never again mentioned in the record. The record is thus at least consistent with Barker's contention that De Groot simply failed to pursue the leads Barker had given him.[4]
 
 
 27
 We reject this claim, however, because Barker has not provided adequate substantiation. At his Marsden hearing he failed to specify the names of these witnesses or the general nature of the testimony they would give. In his petition to the district court and now before us, he has similarly failed to provide the names of these witnesses, their current whereabouts, or to describe the testimony they would give. He has therefore failed to supply us with concrete information which would convince us that De Groot's failure to locate these persons was ineffective assistance, and that it resulted in prejudice to him.
 
 
 28
 We similarly reject Barker's request, first made in his reply brief, that we remand for an evidentiary hearing. See Townsend v. Sain, 372 U.S. 293, 313-14 (1963). Barker has presented no evidence, beyond his bald allegations, that a hearing held nine years after his trial would be likely to cast light upon the significance of the jailhouse witnesses or upon De Groot's failure to call them.[5]
 
 
 29
 IV. Ineffective Assistance of Appellate Counsel
 
 
 30
 Barker contends that his appellate representation before the state court was constitutionally deficient in two ways: counsel failed to "argue the lesser included offense of manslaughter," and failed to argue that trial counsel's assistance was ineffective. The former claim, liberally construed, appears to be that appellate counsel should have argued that Barker was convicted on insufficient evidence. Appellate counsel's effectiveness is judged by the same standards as are applicable to trial counsel. Miller v. Kenney, 882 F.2d 1428, 1433-34 (9th Cir.1989).
 
 
 31
 Appellate counsel engaged in a bold gambit. He apparently decided that Carranza's testimony, unless somehow discredited, was sufficient to sustain Barker's first-degree murder conviction. Therefore, rather than attack the sufficiency of the evidence, he made only one argument in his brief: since Carranza's testimony and the government's theory of the case was that he and Barker conspired to commit a violation of Cal.Veh.Code Sec. 20002 (hit and run driving), an accomplice instruction to the jury was required. Such an instruction would tell the jury that accomplice testimony is inherently untrustworthy, as it "comes from a tainted source," AER 61, and is "often given in the hope or expectation of leniency or immunity." People v. Wallin, 32 Cal.2d 803, 808 (1948); see CALJIC No. 3.18 (accomplice testimony to be viewed with distrust). Counsel argued that had such an instruction been given, the jury would have been less likely to believe Carranza's story (especially given the unexplained drop of Schumacher's blood on his shoe). Without Carranza's testimony, Barker and Wine were the main witnesses; they both supported Barker's theory of the case.
 
 
 32
 The employment of a bold, but sensible, although ultimately unsuccessful, strategy is not ineffective assistance. Moreover, the only other claim of any merit which Barker argues appellate counsel should have brought--a challenge to the sufficiency of the evidence--was rejected out of hand by the California Court of Appeal.[6]
 
 
 33
 V. Trial Court's Failure to Give Accomplice Instruction
 
 
 34
 Barker asserts that the trial court erred in not giving an accomplice instruction. However, he raised this claim neither in his habeas petition filed in district court, nor in his habeas petition filed in the California Supreme Court. See AER 5-6 (district court petition); AER 37 (California Supreme Court petition). We do not generally consider claims not raised in the district court. United States v. Doremus, 888 F.2d 630, 633 n. 3 (9th Cir.1989). Here, the California Court of Appeal's holding--that no accomplice instruction was necessary because murder is not a "natural and probable consequence" of a conspiracy to flee an accident scene--does not constitute such plain error that a manifest injustice would be worked if we failed to consider Barker's claim. See International Union of Bricklayers Local Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1404 (9th Cir.1985) (court will not review issue not raised below unless necessary to prevent manifest injustice).
 
 
 35
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4
 
 
 **
 Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation
 
 
 ***
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 It is not clear from the record whether De Groot convinced Barker to waive his speedy trial rights, or whether the trial court found good cause to continue the trial, despite Barker's assertion of those rights
 
 
 [2]
 People v. Marsden, 2 Cal.3d 118, 84 Cal.Rptr. 156 (1970) (holding that court may not deny defendant's motion for substitution of counsel without giving defendant a chance to state to the court the precise reasons for his motion)
 
 
 [3]
 The other grounds, such as De Groot's alleged statement that he would make $40,000 from Barker's case whether or not he was acquitted, the trial court found to be either fabrications or misunderstandings
 
 
 [4]
 Barker also alleges that De Groot failed to secure a copy of the police tape recording of Werner Schumacher's two calls to police on the night of the murder. He claims this tape would substantiate his claim that Walter Schumacher had been attacking Carranza. We reject this claim as unfounded. Barker has no knowledge of the content of those tapes; he merely hopes they contain something helpful to his case. Moreover, he gives us no reason to question Werner Schumacher's own, unimpeached testimony as to what he said to police that night
 
 
 [5]
 A close reading of the trial transcript reveals that De Groot carefully prepared his cross-examinations of the People's witnesses, effectively questioned them and gave a strong closing argument effectively advancing his client's best factual and legal claims
 
 
 [6]
 Moreover, Barker's claim that appellate counsel should have argued that trial counsel was ineffective must fail because trial counsel was not ineffective. See Part III., supra